Sealed

FILED by /M/ D.C.

JAN 0 9 2018

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

THE UNITED STATES OF AMERICA and
THE STATE OF FLORIDA *ex rel.* JANE DOE,
   Plaintiffs,

  v.

4200 WASHINGTON STREET OPERATIONS
LLC d/b/a/ HILLCREST HEALTH CARE AND
REHABILITATION CENTER; EPSILON
HEALTH CARE PROPERTIES, LLC; CMC II,
LLC d/b/a/ CONSULATE MANAGEMENT;
LAVIE CARE CENTERS, LLC d/b/a
CONSULATE HEALTH CARE; HCCF
MANAGEMENT GROUP, INC; ZAC
MANAGEMENT GROUP, LLC; ALG LAVIE
LLC; CMC II INVESTORS, LLC; COLUMBIA
PACIFIC OPPORTUNITY FUND, L.P.; FC
INVESTORS XXI, LLC; FC LV HOLDCO, LLC;
FLORIDA HEALTH CARE PROPERTIES, LLC;
GENOA HEALTHCARE GROUP, LLC; LV
INVESTMENT, LLC; LV OPERATIONS I, LLC;
LV OPERATIONS II, LLC; MCP LAVIE, LLC;
SAY LA VIE LLC; SENIOR CARE LAVIE,
LLC; 1995 DAVID REIS FAMILY TRUST; LVE
MASTER TENANT 4, LLC; LVE HOLDCO,
LLC; FC ENCORE HOLLYWOOD, LLC; FC
ENCORE MANAGER, LLC; GENESIS
ELDERCARE REHABILITATION SERVICES,
LLC d/b/a GENESIS REHABILITATION
SERVICES; GENESIS HOLDINGS LLC;
GENESIS HEALTHCARE LLC; GEN
OPERATIONS II, LLC; GEN OPERATIONS I,
LLC; FC-GEN OPERATIONS INVESTMENT,
LLC; SUN HEALTHCARE GROUP, INC.;
GENESIS HEALTHCARE, INC.; JOSEPH D.
CONTE; ROBERT HARTMAN; ISAAC M.
NEUBERGER; ASHER LOW; CHRISTOPHER
BRYSON; DANIEL E. DIAS; RUSSELL D.
RAGLAND, JR.; KENNETH USSERY; TROY
M. ANTONIK; JEFFREY K. JELLERSON;
DAVID REIS; ARNOLD M. WHITMAN;
STEVEN E. FISHMAN; FORMATION
CAPITAL, LLC,
   Defendants.

Civil Action No. **18-20099**

**CIV-ALTONAGA**

**FILED UNDER SEAL PURSUANT
TO 31 U.S.C. § 3730(b)(2)**

**DO NOT PLACE IN PRESS BOX
OR ENTER ON PACER OR ANY
PUBLICLY ACCESSIBLE
SYSTEM**

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

/GOODMAN

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................ 1

JURISDICTION AND VENUE ......................................................................................... 1

THE PARTIES.................................................................................................................... 7

GOVERNMENT HEALTH INSURANCE PROGRAMS.............................................. 31

    A.  Health Insurance through Medicare............................................................... 31

        1.  Federal Regulation of SNFs Receiving Medicare Reimbursement ............... 32

        2.  The Prospective Payment System ................................................................... 35

        3.  Medicare Advantage Plans.............................................................................. 40

    B.  TRICARE ....................................................................................................... 42

    C.  Health Insurance Through Medicaid .............................................................. 43

        1.  Federal Medicaid Requirements for SNFs ..................................................... 43

        2.  Florida Medicaid Requirements for SNFs ..................................................... 44

        3.  Reimbursement by Medicaid .......................................................................... 47

STATE AND FEDERAL FALSE CLAIMS ACTS........................................................ 49

DEFENDANTS' SCHEME TO DEFRAUD MEDICARE, MEDICAID, AND TRICARE....... 52

    A.  Relator's Knowledge of the Fraudulent Schemes.......................................... 52

        1.  Provision of Unnecessary Medicare Services to Increase Medicare Billing ................ 52

        2.  Retention of Residents for Additional Days to Increase Medicare Billing.............. 56

        3.  Differential Treatment of Medicaid Residents................................................ 66

        4.  False and Fraudulent Recordation of Therapy to Increase Medicare Billing ............... 69

        5.  Flipping of Medicare Advantage Residents to Increase Medicare Billing .................. 71

        6.  Steering of Business to Hospice Provider Heartland Hospice ........................ 75

        7.  Participation of All Defendants........................................................................ 76

CLAIMS FOR RELIEF .................................................................................................. 82

        COUNT I  Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A) .......... 83

        COUNT II  Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B) ......... 83

        COUNT III  Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G) ....... 84

        COUNT IV  Violation of the Florida False Claims Act, Fla. Stat. § 68.082(2)(a)............ 84

        COUNT V  Violation of the Florida False Claims Act, Fla. Stat. § 68.082(2)(b)............. 85

        COUNT VI  Violation of the Florida False Claims Act, Fla. Stat. § 68.082(2)(g) .......... 85

        COUNT VII  Civil Conspiracy ....................................................................................... 86

CLAIMS FOR RELIEF .................................................................................................. 91

i

## NATURE OF THE ACTION

1.     This is an action brought on behalf of the United States of America and the State of Florida by Plaintiff Jane Doe (hereinafter referred to as "Relator") against Defendants pursuant to the *qui tam* provisions of the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, the Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*, and common law.

2.     The Relator in this case is employed at a skilled nursing facility ("SNF") owned or operated by Defendants or their subsidiaries or affiliates.  The allegations of this Complaint are made on information and belief, including from the Relator's first-hand knowledge of Defendants' unlawful practices in knowingly falsifying numerous statements and claims submitted for reimbursement by the Medicare, Medicaid, and TRICARE programs.

3.     Defendants engaged in a scheme to defraud the United States and the State of Florida of millions of dollars of Medicare, Medicaid, and TRICARE funds each year by misrepresenting the medical condition of, and treatment provided to, residents at Defendants' SNFs.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over Relator's claims under the federal FCA pursuant to 28 U.S.C. §§ 1331, 1345, and 31 U.S.C. § 3732, and has jurisdiction over Relator's claims under the Florida False Claims Act pursuant to 28 U.S.C. §§ 1367 and 31 U.S.C. § 3732(b). Venue is proper under 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a) because the Defendants can be found, reside, and/or transact business in this judicial district, and because acts proscribed by 31 U.S.C. § 3729 and Fla. Stat. § 68.082 have been committed by the Defendants in this judicial district.

5.      Relator's action is not based upon the disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, or from the news media.  At the time the original Complaint was filed, there was no such disclosure, and in any event this action is based on Relator's direct and independent knowledge, not on any such disclosure.  Relator is an "original source" of the information upon which her action is based.  She has direct and independent knowledge of the information on which her action is based, and she voluntarily provided her information to the United States and the State of Florida before filing her Complaint.

6.      Defendants' scheme was encouraged by senior officers of Defendants, who actively encouraged employees to falsify statements and claims submitted to the United States Centers for Medicare and Medicaid Services ("CMS") and the Florida Agency for Health Care Administration ("AHCA").  Defendants also pressured and manipulated employees, such as Relator, who raised concerns about the fraud.

7.      Defendants' scheme relies in part on a practice known as "flipping."  To increase their Medicare and TRICARE reimbursement rates, Defendants made a concerted effort to pick SNF residents up from other insurance programs and move them to Medicare to maximize reimbursement to Defendants.  Defendants consistently undertake to "flip" residents to Medicare in the absence of a medically defensible rationale.  In addition, to facilitate the flipping of their residents, Defendants falsely represent that residents require additional assistance when no such assistance is needed or provided; provide unnecessary rehabilitative therapy; and overstate the amount of rehabilitative therapy provided to residents.

8.      To increase their Medicare and TRICARE reimbursement rates, Defendants also make a concerted effort to ensure that residents remained at their facilities for the maximum 100 days for which payments are allowed under Medicare A.  This consistently occurs regardless of the resident's condition, in the absence of a medically defensible rationale, and is accomplished by falsely representing that residents require additional assistance when no such assistance is needed or provided; by falsely representing that residents cannot safely be permitted to leave the facility; by providing unnecessary rehabilitative therapy; and by overstating the amount of rehabilitative therapy provided to residents.

9.      More recently, on information and belief, Defendants have incorporated Medicare B claims into the scheme by submitting claims for therapy services under Medicare B when such therapy is not needed or provided, including by providing unnecessary rehabilitative therapy and overstating the amount of rehabilitative therapy provided to residents.

10.     Defendants' scheme also relies on the provision of grossly unreasonable and substandard care to residents and falsification of records and documents to hide the misconduct from government officials and residents or their families.

11.     In an effort to retain the profits made possible by their illegal and fraudulent actions in their SNFs, including Defendant 4200 Washington Street Operations LLC d/b/a Hillcrest Healthcare and Rehabilitation Center ("Hillcrest"), Defendants have created a highly convoluted ownership structure whose only purpose can be to make difficult, if not impossible, recovery of the overpayments they have received from the governments of the United States and the State of Florida.

12.     The formation of this type of ownership structure is not unique in this case.  In a 2010 report, the U.S. Government Accountability Office ("GAO") noted the common complex

3

ownership structures and chain affiliations of nursing home chains.[1]  Indeed, recent news articles have focused on the relationship between this ownership structure and the deteriorating quality of care at nursing facilities.[2]  A similar ownership structure is present in this case.  *See* Diagram of Examples of Relationships Between Corporate Defendants, attached hereto as Exhibit 1 ("Ex. 1").  As noted below the SNF where Relator is employed (as well as the other SNFs owned and controlled by Defendants) has one "direct" owner and at least 19 "indirect" owners, all of whom hold ownership interests of 5% or greater and are beneficial owners.

13.     The Defendants noted below with an "indirect" ownership interest in Defendant Epsilon Health Care Properties, LLC (and thus an indirect ownership interest in Epsilon Health Care Properties, LLC's subsidiary, Defendant Hillcrest) include entities known or believed to be subsidiaries of or affiliates of Defendant LaVie Care Centers, LLC d/b/a Consulate Health Care

---

[1] U.S. Gov't Accountability Office, Nursing Homes:  Complexity of Private Investment Purchases Demonstrates Need for CMS To Improve the Usability and Completeness of Ownership Data, Report to Congressional Requesters, GAO-10-710, at 22 (Sept. 2010), http://www.gao.gov/new.items/d10710.pdf.

[2] For example, the New York Times recently published an article on the topic.  *See* Jordan Rau, *Care Suffers as More Nursing Homes Feed Money Into Corporate Webs*, N.Y. Times, Jan. 2, 2018, https://www.nytimes.com/2018/01/02/business/nursing-homes-care-corporate.html.  The article notes that:  (1) owners of nursing homes frequently structure their businesses to outsource services to companies in which they have a financial interest or they control (related party transactions); (2) nearly three-quarters of nursing homes in the United States take advantage of this complex corporate structure; (3) contracts with related companies accounted for $11 billion (or 10%) of nursing home spending in 2015; (4) nursing homes that outsource to related companies often have significant shortcomings, including fewer nurses and aids per patient and higher rates of patient injuries and unsafe practices; (5) nursing homes that outsource to related companies receive nearly twice as many complaints as do independent nursing homes; and (6) this complex corporate structure makes it difficult for injured residents and their families to collect money from the related companies.  *Id*.  Indeed, "[a] 2003 article in the Journal of Health Law encouraged owners to separate their nursing home business into detached entities to protect themselves if the government tried to recoup overpayments or if juries levied large negligence judgments."  *Id*.

4

("Consulate Health Care") or of Formation Capital, LLC ("Formation Capital") (*i.e.*, those names containing "LaVie," "LV," or "FC").

14.     Publicly available documents show that Defendant Epsilon Health Care Properties, LLC's indirect parent company, Defendant Consulate Health Care, generates revenue in excess of a billion dollars.  The known upstream owners of Defendant Consulate Health Care include private equity firms such as Defendant Formation Capital, LLC with billions of dollars under management.[3]

15.     Defendant Formation Capital is the ultimate parent company in Defendants' fraudulent scheme.  On information and belief, Defendants have established an extremely complicated and convoluted ownership structure, described in greater detail below, for the purpose of allowing Formation Capital and its individual investors to reap the monetary benefits of their fraudulent scheme by making it difficult, if not impossible, for the government to trace the flows of Defendants' ill-gotten gains through various shell corporations.  With few exceptions, the entities in Defendants' ownership chain do not engage in day-to-day business and exist merely as holding companies or pass-through entities designed to distribute receipts from government healthcare programs while attempting to provide a shield against liability.  These entities have no independent purpose, no separate management or activities, and no independent decision-making capability.

16.     In general terms, Defendant Formation Capital owns and controls the activities of SNFs nationwide, including Defendant Hillcrest[4], through a set of shell corporations (the

---

[3] Cindy Barth, 2014 Golden 100:  Top Local Private Firms See Revenue Increase by 5.2%, Orlando Bus. J. (Aug. 22, 2014).

[4] Hillcrest's 2015 Medicaid Cost Report filed with the Florida Agency for Health Care Administration identifies "Formation Capital" as the owner of Hillcrest, and "Formation Capital,

"Investor Defendants," as defined below).  The Investor Defendants have the capability to direct the operations of the various SNFs, including Defendant Hillcrest, and use that capability to force the SNFs to submit false or fraudulent claims for reimbursement.  Some of the money from those reimbursements is distributed by the SNFs up their ownership chain to the Investor Defendants and ultimately to Formation Capital and its affiliates.

17.    Defendant Formation Capital also controls the real estate on which those SNFs, including Defendant Hillcrest, are located, through a set of shell corporations that lease the properties to the SNFs (the "Landlord Defendants," as defined below).  Formation Capital and its affiliates use lease agreements between the SNFs under their control and the Landlord Defendants to extract more of the money the SNFs receive from false or fraudulent claims for reimbursement, and distribute it up their ownership chains and ultimately to Formation Capital and its affiliates.  In an April 2016 interview, for example, Defendant Arnold Whitman, co-founder of Formation Capital, explained that by structuring a deal to "expand cash flow and then transfer that additional expanded cash into rent," Formation Capital can "extract" value from its healthcare operating businesses.  *See* Senior Housing News, *Arnold Whitman, Founder and Chairman of Formation Capital* (Apr. 21, 2016), *available at* https://leadership.seniorhousingnews.com/arnold-whitman-founder-and-chairman-of-formation-capital.

18.    Defendant Formation Capital also controls the rehabilitation services offered at the SNFs through its control of Defendant Genesis Healthcare, Inc. ("Genesis") and subsidiaries or affiliates thereof (the "Genesis Defendants," as defined below).  Formation Capital affiliates

---

LLC" as a related landlord.  4200 Washington Street Operations LLC, 2015 Cost Report, Florida Medicaid Program Nursing Home Service Providers ("Hillcrest 2015 Cost Report") at 50-51.

own substantial equity interests in Genesis, which was wholly owned by private investors sponsored by Formation Capital affiliates until February 2015. Through their control of the SNFs' operations and of Genesis, Formation Capital and its affiliates cause the SNFs in their control, including Defendant Hillcrest, to enter into contracts with the Genesis Defendants to provide rehabilitation therapy services at the SNFs. Those contracts provide yet another avenue for the distribution of payments received based on false or fraudulent claims for reimbursement into an ownership chain with substantial beneficial interests held by Formation Capital and its affiliates, in the amount of hundreds of millions of dollars per year. Additionally, the contracts with Genesis allow Formation Capital and its affiliates to promote their fraudulent scheme at the SNFs by engaging in the improper therapy-related billing practices described herein.

19.     Defendant Formation Capital exercises its control of these various entities not only through its ownership interests in them but also through the work of several investors, officers, and other individuals affiliated with Formation Capital (the "Individual Defendants," as defined below). The Individual Defendants hold various positions as officers, directors, or managers of the various entities in Defendant Formation Capital's network and use those positions to ensure that the entity defendants engage in the fraudulent scheme described below.

## THE PARTIES

### I.     Relator

20.     Relator is a citizen of the United States of America and a resident of the State of Florida. Relator is a degreed health professional having received her master's degree in a health-related field from an accredited university. Relator also completed an advanced program in her field. Relator has worked for Defendants since before 2010.

## II.     Defendants

### A.     Hillcrest

21.     Defendant Hillcrest is a limited liability company, organized under the laws of the State of Florida on November 17, 2011.  Hillcrest is the successor-in-interest to Washington Manor Health Care Associates, LLC by way of a merger that occurred on February 1, 2012. Hillcrest and its predecessor do (or did) business under the name Hillcrest Health Care and Rehabilitation Center and operate (or operated) a SNF at 4200 Washington Street, Hollywood, FL 33021.  The registered agent for Defendant Hillcrest is Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301-2525.

### B.     The Management Defendants

22.     Defendant Epsilon Health Care Properties, LLC ("Epsilon HCP") is a limited liability company organized under the laws of the State of Florida on February 4, 2004.  Epsilon HCP's principal place of business is located at 800 Concourse Parkway South, Maitland, FL 32751.  The nursing home ownership database maintained by CMS identifies Defendant Epsilon HCP as holding a 100% direct ownership of Defendant Hillcrest and as the whole owner of 45 nursing homes in Florida, including Hillcrest.  The most recent annual report for Defendant Hillcrest filed with the Florida Secretary of State in April 2017 identified Epsilon HCP as a member of the Hillcrest limited liability company, and was signed by Defendant Daniel E. Dias as an officer of Epsilon HCP.  The registered agent for Defendant Epsilon HCP is Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301-2525.

23.     The most recent annual report for Defendant Epsilon HCP filed with the Florida Secretary of State in April 2017 was signed by Defendant Daniel E. Dias ("Dias") as an officer, and identified Defendant Kenneth Ussery ("Ussery") as Treasurer.  Mr. Dias is currently the

8

Chief Corporate Counsel for Defendant Consulate Health Care.  Mr. Ussery is the Senior Vice President of Revenue Cycle Management and Treasury Services for Defendant Consulate Health Care.  The 2006 annual report for Defendant Epsilon HCP filed with the Florida Secretary of State named Defendant Florida Health Care Properties, LLC as the sole member of Defendant Epsilon HCP.

24.     Defendant CMC II, LLC d/b/a/ Consulate Management ("Consulate Management") is identified in the CMS nursing home ownership database as having "operational/managerial control" over Defendant Hillcrest.  Defendant Consulate Management is a limited liability company organized under the laws of the State of Florida on October 7, 2011.  Its place of business is located at 800 Concourse Parkway South, Maitland Florida 32751.  Defendant Consulate Management is a wholly-owned subsidiary of Defendant Consulate Health Care.  The most recent annual report for Defendant Consulate Management filed with the Florida Secretary of State in April 2017 was signed by Defendant Dias (Officer) and listed Defendant Consulate Health Care as its managing member.  The articles of organization for Defendant Consulate Management were amended in July 2012 and the amendment was signed by non-party Christina Firth, as manager of Consulate Management's sole member, Defendant Consulate Health Care.  At that time, Ms. Firth was a Senior Vice President of Defendant Formation Capital.  The registered agent for Defendant Consulate Management is Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301.

25.     Defendant LaVie Care Centers, LLC d/b/a/ Consulate Health Care ("Consulate Health Care") is identified by the CMS nursing home ownership database as one of the entities holding an indirect ownership interest of 5% or more of facilities directly owned by Defendant Epsilon HCP, including Defendant Hillcrest.  Defendant Consulate Health Care is a limited

9

liability company organized under the laws of the State of Delaware on September 8, 2011. Its

principal place of business is located at 800 Concourse Parkway South, Maitland, FL 32751.

The website of Defendant Formation Capital lists LaVie Care Centers (*i.e.*, Defendant Consulate

Health Care) as an "Unrealized" holding in Formation Capital's "Services" portfolio. *See*

http://formationcapital.com/services.php. The registered agent for Defendant LaVie Care

Centers, LLC is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

26.     The entity defendants identified in paragraphs 22, 24, and 25 are collectively

referred to herein as the "Management Defendants."

**C.     The Formation Capital Defendants**

27.     Defendant HCCF Management Group, Inc. ("HCCF") owns 30% of Defendant

Formation Capital, according to a March 2017 filing by Formation Capital with the U.S.

Securities and Exchange Commission ("SEC"). Defendant HCCF is a corporation organized

under the laws of the State of Georgia on January 27, 1997. Its principal place of business is

3500 Lenox Road NE, Suite 510, Atlanta, GA 30326. It shares this office with Defendant

Formation Capital. Defendant Arnold M. Whitman owns 100% of HCCF and is its Chief

Executive Officer ("CEO"), President, and Chief Financial Officer ("CFO"), according to filings

with the SEC and Georgia Secretary of State. The registered agent for HCCF is C T Corporation

System, 289 S. Culver Street, Lawrenceville, GA 30046.

28.     Defendant ZAC Management Group, LLC ("ZAC") owns 30% of Defendant

Formation Capital, according to a March 2017 SEC filing by Formation Capital. Defendant

ZAC is a limited liability company organized under the laws of the Commonwealth of

Pennsylvania on March 7, 1997. It is the survivor of a 2011 merger with, and is the successor in

interest and liability to, ZAC Capital Partners, LLC. Its principal place of business is 1617 John

10

F. Kennedy Boulevard, Suite 545, Philadelphia, PA 19103. Defendant Steven E. Fishman owns

80% of ZAC and is its "Managing Member," according to filings with the SEC and Pennsylvania

Department of State. The registered agent for ZAC is Corporation Service Company, 2595

Interstate Drive, Suite 103, Harrisburg, PA 17110.

29.     The entity defendants identified in paragraphs 27 and 28 are collectively referred

to herein as the "Formation Capital Defendants." On information and belief, the Formation

Capital Defendants are owners of Defendant Formation Capital, with a collective ownership

share of at least 60%.

### D.     The Investor Defendants

30.     Defendant ALG LaVie LLC ("ALG LaVie") is identified by the CMS nursing

home ownership database as one of the entities holding an indirect ownership interest of 5% or

more of properties directly owned by Defendant Epsilon HCP, including Defendant Hillcrest.

ALG LaVie is a limited liability company organized under the laws of the State of Delaware on

November 14, 2011. The registered agent for Defendant ALG LaVie is VCORP Services, LLC,

1013 Centre Road, Suite 403-B, Wilmington, DE 19805. ALG LaVie follows a naming

convention similar to other ownership vehicles affiliated with Defendants Asher Low and

Formation Capital. *See infra* ¶ 64.

31.     Defendant CMC II Investors, LLC ("CMC II Investors") is identified by the CMS

nursing home ownership database as one of the entities holding an indirect ownership interest of

5% or more of properties directly owned by Defendant Epsilon HCP, including Defendant

Hillcrest. CMC II Investors is a limited liability company organized under the laws of the State

of Florida on December 15, 2011. Its principal place of business is 800 Concourse Parkway

South, Maitland, FL 32751. That address is the same as the principal place of business of

11

Defendant Epsilon HCP.  The annual reports for CMC II Investors filed with the Florida Secretary of State were signed by Defendant Joseph Conte ("Conte") and indicate that Mr. Conte is the "manager" of CMC II Investors.  The registered agent for Defendant CMC II Investors is Noelle C. Herrman, c/o Dias & Associates, LLC, 5102 W. Laurel Street, Suite 700, Tampa, FL 33607.

32.     Defendant Columbia Pacific Opportunity Fund, L.P. ("CPO Fund") is identified by the CMS nursing home ownership database as one of the entities holding an indirect ownership interest of 5% or more of properties directly owned by Defendant Epsilon HCP, including Defendant Hillcrest.  CPO Fund is a hedge/private equity fund organized as a limited partnership under the laws of the State of Washington on February 15, 2007.  CPO Fund has a gross asset value of approximately $391.4 million.  The governing persons of CPO Fund are Columbia Pacific Advisors, LLC, a limited liability company organized under the laws of the State of Washington on December 14, 2006.  Approximately 30% of Defendant CPO Fund is owned by Columbia Pacific Advisors, LLC or related persons.  In an August 18, 2014 contract relating to Genesis Healthcare, Inc.'s merger with Skilled Healthcare Group, Inc., CPO Fund is listed as a member of a group of investors run by Defendant Formation Capital.  The agreement provides that any notice to be delivered to those investors, including CPO Fund, is to be delivered to Formation Capital on their behalf.  The registered agent for Defendant CPO Fund is RSC Corporation, 1201 3rd Avenue #3400, Seattle, WA 98101.

33.     Defendant FC Investors XXI, LLC ("FCI XXI") is identified by the CMS nursing home ownership database as one of the entities holding an indirect ownership interest of 5% or more of properties directly owned by Defendant Epsilon HCP, including Defendant Hillcrest.  FCI XXI is a private equity fund organized under the laws of the State of Delaware on

12

September 8, 2011 and has a gross asset value of approximately $175.2 million.  Approximately 11% of this fund is beneficially owned by Formation Capital or related persons.  FCI XXI is managed by an affiliate of Formation Capital.  The registered agent for Defendant FCI XXI is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

34.     Defendant FC LV Holdco, LLC ("FC LV Holdco") is identified by the CMS nursing home ownership database as one of the entities holding an indirect ownership interest of 5% or more of properties directly owned by Defendant Epsilon HCP, including Defendant Hillcrest.  FC LV Holdco is a limited liability company organized under the laws of the State of Delaware on August 17, 2012.  The registered agent for Defendant FC LV Holdco is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

35.     Defendant Florida Health Care Properties, LLC ("Florida HCP") is identified by the CMS nursing home ownership database as one of the entities holding an indirect ownership interest of 5% or more of properties directly owned by Defendant Epsilon HCP, including Defendant Hillcrest.  Florida HCP is a limited liability company organized under the laws of the State of Florida on July 30, 2001.  Florida HCP is the successor-in-interest to LV Acquisition II LLC by way of a merger that occurred on December 30, 2011, and is the sole member of Defendant Epsilon HCP.  Florida HCP's principal place of business is 800 Concourse Parkway South, Maitland, FL 32751.  That address is the same as the principal place of business of Defendants Epsilon HCP, Consulate Management, Consulate Health Care, CMC II Investors, LVE Master Tenant 4, LLC, and LVE Holdco, LLC.  The two most recent annual reports filed with the Florida Secretary of State (in April 2017 and in April 2016) by Florida HCP were signed by Defendant Dias (Officer in 2017, President in 2016) and named Defendant Ussery (Treasurer) as an "authorized person."  The 2015 annual report for Florida HCP was signed by

13

Defendant Russell D. Ragland, Jr. as Vice President. The registered agent for Defendant Florida HCP is Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301-2525.

36.    Defendant Genoa Healthcare Group, LLC ("Genoa") is identified by the CMS nursing home ownership database as one of the entities holding an indirect ownership interest of 5% or more of properties directly owned by Defendant Epsilon HCP, including Defendant Hillcrest. Defendant Genoa is a limited liability company organized under the laws of the State of Delaware on May 13, 2005. Genoa was acquired by a group of investors sponsored by Defendant Formation Capital, including Defendant Consulate Health Care, pursuant to a September 2011 merger agreement. The registered agent for Defendant Genoa is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

37.    Defendant LV Investment, LLC ("LVI") is identified by the CMS nursing home ownership database as one of the entities holding an indirect ownership interest of 5% or more of properties directly owned by Defendant Epsilon HCP, including Defendant Hillcrest. Defendant LVI is a limited liability company organized under the laws of the state of Delaware on September 8, 2011. The registered agent for Defendant LVI is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

38.    Defendant LV Operations I, LLC ("LVO-I") is identified by the CMS nursing home ownership database as one of the entities holding an indirect ownership interest of 5% or more of properties directly owned by Defendant Epsilon HCP, including Defendant Hillcrest. LVO-I is a limited liability company organized under the laws of the State of Delaware on September 8, 2011. The registered agent for Defendant LVO-I is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

39.     Defendant LV Operations II, LLC ("LVO-II") is identified by the CMS nursing home ownership database as one of the entities holding an indirect ownership interest of 5% or more of properties directly owned by Defendant Epsilon HCP, including Defendant Hillcrest. LVO-II is a limited liability company organized under the laws of the State of Delaware on September 8, 2011. Defendants LVI, LVO-I, and LVO-II were all formed on this same date. The registered agent for Defendant LVO-II is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

40.     Defendant MCP LaVie, LLC ("MCP LaVie") is identified by the CMS nursing home ownership database as one of the entities holding an indirect ownership interest of 5% or more of properties directly owned by Defendant Epsilon HCP, including Defendant Hillcrest. MCP LaVie is a limited liability company organized under the laws of the State of Delaware on September 27, 2011. MCP LaVie follows a naming convention similar to other ownership vehicles affiliated with Defendants Robert Hartman and Formation Capital. *See infra* ¶ 62. The registered agent for Defendant MCP La Vie is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

41.     Defendant Say La Vie LLC ("Say La Vie") is identified by the CMS nursing home ownership database as one of the entities holding an indirect ownership interest of 5% or more of properties directly owned by Defendant Epsilon HCP, including Defendant Hillcrest. Defendant Say La Vie is a limited liability company organized under the laws of the State of Delaware on October 4, 2011. The registered agent for Defendant Say La Vie is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

42.     Defendant Senior Care LaVie, LLC ("Senior Care LaVie") is identified by the CMS nursing home ownership database as one of the entities holding an indirect ownership

interest of 5% or more of properties directly owned by Defendant Epsilon HCP, including Defendant Hillcrest. Defendant Senior Care LaVie is a limited liability company organized under the laws of the State of Delaware on September 28, 2011. The registered agent for Defendant Senior Care LaVie is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. Senior Care LaVie follows a naming convention shared by other entities owned by or affiliated with Defendant David Reis, including entities such as Senior Care Development, LLC; Senior Care Holdings, LLC; and Senior Care Genesis, LLC. *See infra* ¶ 72.

43.     Defendant 1995 David Reis Family Trust is identified by the CMS nursing home ownership database as one of the entities holding an indirect ownership interest of 5% or more of facilities directly owned by Defendant Epsilon HCP, including Defendant Hillcrest. Defendant David Reis is a trustee of this trust. On information and belief, the address for the 1995 David Reis Family Trust is 234 Church Street, Suite 901, New Haven, CT 06510.

44.     The entity defendants identified in paragraphs 30 through 43 are collectively referred to herein as the "Investor Defendants." On information and belief, the Investor Defendants are subsidiaries or affiliates of Defendant Formation Capital, or are owned by or affiliated with an individual affiliated with Formation Capital. Collectively, the Investor Defendants, together with individual Defendants Conte, Neuberger, Hartman, Low, and Reis, hold substantial ownership interests in, and are able to exercise operational control over, facilities directly owned by Defendant Epsilon HCP, including Defendant Hillcrest.

**E.     The Landlord Defendants**

45.     Defendant LVE Master Tenant 4, LLC ("LVE Master Tenant") is a limited liability company organized under the laws of the State of Delaware on August 24, 2015. Its

principal place of business is "c/o LaVie Care Centers, LLC" at 800 Concourse Parkway South, Maitland, FL 32751. On July 1, 2016, Defendant LVE Master Tenant entered into a sublease with Defendant Hillcrest for the Hillcrest Health Care and Rehabilitation Center facility. The Memorandum of Sublease for this transaction was signed by Defendant Russell D. Ragland, Jr. for both parties to the agreement – as the CFO of Defendant LVE Master Tenant, and as the CFO of Defendant Hillcrest. The most recent annual report for Defendant LVE Master Tenant filed with the Florida Secretary of State in April 2017 was signed by Defendant Daniel E. Dias as an Officer. Mr. Dias also signed the June 2016 application for Defendant LVE Master Tenant to conduct business in the State of Florida. That application named Defendant LVE Holdco, LLC as the company's sole member. The registered agent for Defendant LVE Master Tenant is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

46.     Defendant LVE Holdco, LLC ("LVE Holdco") is a limited liability company organized under the laws of the State of Delaware on August 31, 2015. Defendant LVE Holdco is the parent company and sole member of Defendant LVE Master Tenant. Its business address is "c/o LaVie Care Centers, LLC" at 800 Concourse Parkway South, Maitland, FL 32751. The registered agent for Defendant LVE Holdco is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

47.     Defendant FC Encore Hollywood, LLC ("FC Encore Hollywood") is a limited liability company organized under the laws of the State of Florida on September 4, 2015. Its principal place of business is 3500 Lenox Road NE, Suite 510, Atlanta, GA 30326. It shares this office with Defendant Formation Capital. On information and belief, Defendant FC Encore Hollywood is a subsidiary or affiliate of Defendant Formation Capital and is the owner of the real property used by Defendant Hillcrest. Hillcrest's 2015 Medicaid Cost Report filed with

AHCA identified Defendant Formation Capital as a related landlord. *See* Hillcrest 2015 Cost Report at 51. The most recent annual report for Defendant FC Encore Hollywood filed with the Florida Secretary of State in April 2017 was signed by non-party Scott Brown and named Defendant FC Encore Manager, LLC ("FC Encore Manager") as the company's manager. Non-party Scott Brown is the Managing Director of Portfolio Management at Defendant Formation Capital. Defendant FC Encore Hollywood entered into a master lease agreement with Defendant LVE Master Tenant on July 1, 2016. The Memorandum of Master Lease was signed by non-party Stephanie Hamner as an authorized officer of Defendant FC Encore Hollywood, LLC. Ms. Hamner is the Senior Vice President of Asset Management at Defendant Formation Capital. That same month, the Hillcrest property was transferred by Special Warranty Deed to Defendant FC Encore Hollywood by non-party FC Encore Core Properties, LLC. The registered agent for Defendant FC Encore Hollywood is Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301.

48.     Defendant FC Encore Manager is a limited liability company organized under the laws of the State of Delaware on September 2, 2015. On information and belief, Defendant FC Encore Manager is a subsidiary or affiliate of Defendant Formation Capital and is the manager of Defendant FC Encore Hollywood. Defendant FC Encore Manager's principal place of business is 3500 Lenox Road NE, Suite 510, Atlanta, GA 30326. It shares this office with Defendant Formation Capital. In July 2016, non-party Stephanie Hamner signed the Special Warranty Deed transferring the Hillcrest property from non-party FC Encore Core Properties, LLC to Defendant FC Encore Hollywood, as an authorized officer of Defendant FC Encore Manager, manager of non-party FC Encore Core Properties, LLC. The registered agent for Defendant FC Encore Manager is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE

19808.

49.     The entity defendants identified in paragraphs 45 through 48 are collectively referred to as the "Landlord Defendants."

**F.     The Genesis Defendants**

50.     Defendant Genesis ElderCare Rehabilitation Services, LLC d/b/a Genesis Rehabilitation Services ("Genesis Rehab") is a limited liability company organized under the laws of the Commonwealth of Pennsylvania on January 30, 2015.  It is the survivor of a 2015 merger with, and is the successor in interest and liability to, Genesis Eldercare Rehabilitation Services, Inc., a corporation organized under the laws of the Commonwealth of Pennsylvania on November 28, 1986.  Its corporate offices are located at 101 East State Street, Kennett Square, PA 19348.  According to its website, Genesis Rehab provides "physical therapy, occupational therapy, speech therapy, respiratory therapy, and wellness services, primarily for the older adult population," and "partners with skilled nursing centers" to provide these services.  *See* http://www.genesisrehab.com/.  According to multiple SEC filings by Defendant Genesis, Genesis Rehab has entered into hundreds of agreements with Consulate Health Care facilities, under which the Consulate facilities paid Genesis Rehab potentially in excess of $150 million in 2014, $160 million in 2015, and $155 million in 2016.  During at least part of this time, the agreements between Genesis Rehab and the Consulate Health Care SNFs were not approved by the audit committee of the board of directors of Genesis, even though both Genesis and Consulate Health Care were both owned and controlled by affiliates of Defendant Formation Capital.  Genesis Rehab is a direct subsidiary of Defendant Genesis Holdings LLC and an indirect subsidiary of Defendant Genesis Healthcare, Inc.  The registered agent for Defendant

Genesis Rehab is Corporation Service Company, 2595 Interstate Drive, Suite 103, Harrisburg, PA 17110.

51.      Defendant Genesis Holdings LLC ("Genesis Holdings") is a limited liability company organized under the laws of the State of Delaware on October 7, 2014.  Defendant Genesis Holdings is the parent company of Genesis Rehab, a direct subsidiary of Defendant Genesis Healthcare LLC, and an indirect subsidiary of Defendant Genesis Healthcare, Inc.  The registered agent for Defendant Genesis Holdings is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

52.      Defendant Genesis Healthcare LLC ("Genesis HC") is a limited liability company organized under the laws of the State of Delaware on August 9, 2010.  Defendant Genesis HC is the parent company of Defendant Genesis Holdings, a direct subsidiary of Defendant GEN Operations II, LLC, and an indirect subsidiary of Defendant Genesis Healthcare, Inc.  The registered agent for Defendant Genesis HC is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

53.      Defendant GEN Operations II, LLC ("GEN Operations II") is a limited liability company organized under the laws of the State of Delaware on August 9, 2010.  Defendant GEN Operations II is the parent company of Defendant Genesis HC and a direct subsidiary of Defendant GEN Operations I, LLC.  It is an indirect subsidiary of Defendant Genesis Healthcare, Inc.  The registered agent for Defendant GEN Operations II is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

54.      Defendant GEN Operations I, LLC ("GEN Operations I") is a limited liability company organized under the laws of the State of Delaware on August 9, 2010.  Defendant GEN Operations I is the parent company of Defendant GEN Operations II, LLC and a direct

subsidiary of Defendant FC-GEN Operations Investment, LLC. It is an indirect subsidiary of Defendant Genesis Healthcare, Inc. The registered agent for Defendant GEN Operations I is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

55.     Defendant FC-GEN Operations Investment, LLC ("FC-GEN") is a limited liability company organized under the laws of the State of Delaware on August 9, 2010. Defendant FC-GEN is the parent company of Defendant GEN Operations I, a direct subsidiary of Defendant Sun Healthcare Group, Inc., and an indirect subsidiary of Defendant Genesis Healthcare, Inc. The registered agent for Defendant FC-GEN is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

56.     Defendants FC-GEN, GEN Operations I, and GEN Operations II are ultimately controlled by Defendant Genesis Healthcare, Inc. and do not have independent decision-making authority or separate corporate officers. In an April 2016 financing agreement between Defendants Genesis Healthcare, Inc., FC-GEN, GEN Operations I, and GEN Operations II, for example, Michael S. Sherman signed the agreement on behalf of each of those four entities as the Senior Vice President, Secretary, and Assistant Treasurer of each.

57.     Defendant Sun Healthcare Group, Inc. ("Sun Healthcare") is a corporation organized under the laws of the State of Delaware on December 11, 2002. Defendant Sun Healthcare is the parent company of Defendant FC-GEN and a direct subsidiary of Defendant Genesis Healthcare, Inc. The registered agent for Defendant Sun Healthcare is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

58.     Defendant Genesis Healthcare, Inc. ("Genesis") is a corporation organized under the laws of the State of Delaware on October 21, 2005. Its corporate offices are located at 101 East State Street, Kennett Square, PA 19348. Defendant Genesis is a publicly-traded company

that, with and through its subsidiaries, owns and operates skilled nursing facilities and assisted/senior living facilities in the United States. Prior to February 2015, Genesis was privately owned by private investors sponsored by affiliates of Defendant Formation Capital. The registered agent for Defendant Genesis is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

59. The Genesis Defendants provided rehabilitative therapy at the facility run by Defendant Hillcrest, in addition to other facilities run by the Manager Defendants, and were compensated based on the Medicare and TRICARE reimbursements received by the facility. As further alleged below, Defendant Genesis knowingly participated in the submission of false or fraudulent statements and claims to Medicare and TRICARE. Defendant Genesis is a client of Formation Healthcare Group, a division of Defendant Formation Capital as described in greater detail below. *See infra* ¶ 79. According to SEC filings by Defendant Genesis, prior to February 2, 2015, Defendant Genesis was wholly owned by private investors sponsored by affiliates of Defendant Formation Capital.

60. The entity defendants identified in paragraphs 50 through 59 are collectively referred to herein as the "Genesis Defendants."

G. **The Individual Defendants**

61. Defendant Joseph ("Joe") D. Conte ("Conte") is identified by the CMS nursing home ownership database as one of the individuals holding an indirect ownership interest of 5% or more of facilities directly owned by Defendant Epsilon HCP, including Defendant Hillcrest. Mr. Conte co-founded Defendant Consulate Health Care (known at the time of its founding as "Tandem Health Care") and was its CEO until September 14, 2015, when he was promoted to Executive Vice Chairman. Mr. Conte was CEO of Consulate Health Care at the time that

22

Defendant Formation Capital installed Consulate Health Care to manage the nursing homes in its

LaVie Care Centers portfolio, including Defendant Hillcrest.  Mr. Conte signed every annual

report filed by Defendant CMC II Investors with the Florida Secretary of State as the "manager"

of CMC II Investors.  Mr. Conte also signed the 2012 annual report for Defendant CMC II, LLC

as its "manager."  On information and belief, Mr. Conte resides at 550 Via Lugano, Winter Park,

FL 32789.

       62.     Defendant Robert Hartman ("Hartman") is identified by the CMS nursing home

ownership database as one of the individuals holding an indirect ownership interest of 5% or

more of facilities directly owned by Defendant Epsilon HCP, including Defendant Hillcrest.  An

April 2017 SEC filing by Defendant Genesis states that Mr. Hartman is an indirect owner of

Defendant Consulate Health Care.  On information and belief, Mr. Hartman is an investor with

or affiliate of Formation Capital, which lists LaVie Care Centers on its website as an

"Unrealized" holding within the portfolio of Formation Capital.  Mr. Hartman is also affiliated

with multiple companies affiliated with Formation Capital, including MCP Genesis, LLC and

Midway Gen Capital, LLC, and the Robert Hartman Family Trust, all of which were represented

by Formation Capital in connection with Formation Capital's merger of Genesis Healthcare, Inc.

with Skilled Healthcare Group, Inc.  Mr. Hartman has been a Genesis director since 2015.  On

information and belief, Mr. Hartman's business address is 6633 N. Lincoln Avenue,

Lincolnwood, IL 60712.

       63.     Defendant Isaac M. Neuberger ("Neuberger") is identified by the CMS nursing

home ownership database as one of the individuals holding an indirect ownership interest of 5%

or more of facilities directly owned by Defendant Epsilon HCP, including Defendant Hillcrest.

Mr. Neuberger is a partner at Neuberger, Quinn, Gielen, Rubin, and Gibber, P.A.  Mr. Neuberger

23

is an indirect owner of Defendant LaVie Care Centers, LLC and is an investor with or affiliate of Formation Capital. Mr. Neuberger is the managing member of 14 entities that hold ownership interests in Defendant Genesis, and has been granted observer rights on the Genesis Board of Directors. Mr. Neuberger is also affiliated with multiple companies represented by Formation Capital, including Gazelle Gen, LLC and Mid Atlantic Healthcare Investors, LLC. On information and belief, Mr. Neuberger's business address is One South Street, 27th Floor, Baltimore, MD 21202.

64.     Defendant Asher Low ("Low") is identified by the CMS nursing home ownership database as one of the individuals holding an indirect ownership interest of 5% or more of facilities directly owned by Defendant Epsilon HCP, including Defendant Hillcrest. According to a July 2016 SEC filing, Mr. Low was the beneficial owner of Genesis Healthcare, Inc. securities held by ALG Genesis, LLC. Mr. Low is identified in filings by Defendant Genesis as the manager of ALG Genesis, LLC. ALG Genesis, LLC is an affiliate of Defendant Formation Capital that held an ownership interest in Defendant Genesis prior to February 2015. In an August 18, 2014 contract relating to Defendant Genesis's merger with Skilled Healthcare Group, Inc., ALG Genesis is listed as a member of a group of investors run by Defendant Formation Capital. The agreement provides that any notice to be delivered to those investors, including ALG Genesis, is to be delivered to Defendant Formation Capital on their behalf. On information and belief, Mr. Low's address is 7 Tori Drive, Lakewood, NJ 08701.

65.     Defendant Christopher ("Chris") Bryson ("Bryson") is identified in the CMS nursing home ownership database as one of the individuals having operational/managerial control of Defendant Hillcrest. Mr. Bryson was Chief Operating Officer ("COO") of Consulate Health Care from September 2015 to September 2016, and has served as CEO of Consulate

Health Care since September 2016.  Prior to being named COO in 2015, Mr. Bryson served as a senior advisor to Defendant Formation Capital.  Mr. Bryson's principal place of business is 800 Concourse Parkway South, Maitland, FL 32751.

66.     Defendant Daniel E. Dias is identified in the CMS nursing home ownership database as one of the individuals having operational/managerial control of Defendant Hillcrest. Mr. Dias has been the Chief Corporate Counsel for Consulate Health Care since January 2013, after serving as outside Corporate Counsel since 2006.  Mr. Dias has signed annual reports filed with the Florida Secretary of State for at least five Defendants, including the 2016 annual reports for Defendant Epsilon HCP (as President), Defendant Florida HCP (as President), and Defendant Hillcrest (as President of its member, Epsilon HCP), and the 2017 annual reports for Defendant LVE Master Tenant and Defendant Consulate Management.  The principal place of business for Mr. Dias is 800 Concourse Parkway South, Maitland, FL 32751.

67.     Non-party Dias & Associates, P.A. is a law firm that serves as the in-house counsel to Defendant Consulate Health Care, among others.  Defendant Dias is a principal of Dias & Associates, P.A.  Dias & Associates, P.A. is the successor counsel for Defendant Consulate Health Care to Mancuso & Dias, P.A., in which Defendant Dias was also a principal. Defendant Dias and/or his law firms have simultaneously represented multiple of the Defendants, including Defendants Consulate Health Care and Consulate Management, indicating that those defendants have a unity of interests.

68.     Defendant Russell D. Ragland, Jr. ("Ragland") is identified in the CMS nursing home ownership database as one of the individuals having operational/managerial control of Defendant Hillcrest.  Mr. Ragland was the CFO of Consulate Health Care from July 2014 until his retirement in October 2017.  According to annual reports filed with the Florida Secretary of

State and real estate transactions recorded with the Broward County Clerk, Mr. Ragland held similar positions of authority in other Defendant entities, including CFO of Defendant Hillcrest; Vice President and CFO of Defendant Epsilon HCP; Vice President of Defendant Florida HCP; CFO of Defendant Consulate Management; and CFO of Defendant LVE Master Tenant. On information and belief, Mr. Ragland resides at 4451 Gulf Shore Boulevard North, Apartment 1402, Naples, FL 34103.

69.     Defendant Kenneth Ussery is identified in the CMS nursing home ownership database as one of the individuals having operational/managerial control of Defendant Hillcrest. Mr. Ussery is the Senior Vice President of Revenue Cycle Management and Treasury Services for Consulate Health Care. According to the most recent annual reports filed with the Florida Secretary of State for Defendant Epsilon HCP and Defendant Florida HCP in April 2017, Mr. Ussery is the Treasurer for both of these entities. Mr. Ussery's principal place of business is 800 Concourse Parkway South, Maitland, FL 32751.

70.     Defendant Troy M. Antonik ("Antonik") was Mr. Ragland's predecessor as CFO of Consulate Health Care from December 2011 to July 2014. Mr. Antonik signed the 2012 through 2014 annual reports filed with the Florida Secretary of State for Defendant Epsilon HCP and Defendant Florida HCP as their Vice President and/or CFO, and the 2013 and 2014 annual reports filed with the Florida Secretary of State for Defendant Consulate Management as its CFO. Mr. Antonik's principal place of business is 114 West First Street, Suite 218, Sanford, FL 32771.

71.     Defendant Jeffrey K. Jellerson ("Jellerson") was Executive Vice President and COO of Consulate Health Care from July 2006 until approximately September 2015, when he was succeeded by Mr. Bryson as COO. Mr. Jellerson signed the 2015 annual reports filed with

the Florida Secretary of State for Defendant Epsilon HCP (as President and CEO), for Defendant Florida HCP (as President), and for Defendant Consulate Management (as its COO).  Mr. Jellerson was identified as having similar roles in filings for Defendant Epsilon HCP and Defendant Florida HCP, LLC in 2012 through 2014.  On information and belief, Mr. Jellerson resides at 7057 Highfields Farm Drive, Roanoke, VA 24018.

72.     Defendant David Reis ("Reis") is or was, through an affiliated company, a partner and investor with Defendant Formation Capital, and is an indirect owner of Defendant Consulate Health Care.  An April 2017 filing with the SEC by Defendant Genesis confirmed that Defendant Reis indirectly holds ownership interests in Consulate Health Care, which that filing describes as a subsidiary of Defendant Consulate Health Care (*i.e.*, LaVie Care Centers, LLC).  Mr. Reis has been a director of Defendant Genesis since 2015.  Mr. Reis was also an owner of Defendant Genesis during the time it was privately held exclusively by affiliates of Defendant Formation Capital.  According to the website of Senior Care Development, LLC, an affiliate of Mr. Reis, Mr. Reis is "Managing Member" of several affiliates, including Senior Care Holdings, LLC, through which he is or was "both a partner and investor in [Defendant] Formation Capital, LLC" deals, including Formation Capital's takeover of Defendant Genesis.  According to the Senior Care Development, LLC website, Mr. Reis has taken an active role in the management of Defendant Genesis and "help[ed] to engineer" the "evolution" of Genesis between 2007 and 2015.  *See* http://www.seniorcaredevelopment.com/teamReis.php.  On information and belief, Mr. Reis resides at 240 Riverside Boulevard, Apt. 21B, New York, NY 10069.

73.     Defendant Arnold M. Whitman ("Whitman") is a co-founder and Chairman of Defendant Formation Capital, LLC, and has been a director of Defendant Genesis since 2015.  An April 2017 SEC filing by Defendant Genesis confirmed that Mr. Whitman is an indirect

owner of Defendant Consulate Health Care. Mr. Whitman's principal place of business is 3500 Lenox Road NE, Suite 510, Atlanta, GA 30326.

74.     Defendant Steven E. Fishman ("Fishman") is a co-founder, President, and Co-Chairman of Defendant Formation Capital, LLC and served as Chairman of the Board of Directors of Defendant Genesis from February 2, 2015 until April 2017. An April 2017 SEC filing by Defendant Genesis confirmed that Mr. Fishman is an indirect owner of Defendant Consulate Health Care. Mr. Fishman's principal place of business is 3500 Lenox Road NE, Suite 510, Atlanta, GA 30326.

75.     The individual defendants identified in paragraphs 61 through 74 are collectively referred to herein as the "Individual Defendants." Each of the Individual Defendants is an affiliate of Formation Capital and/or was hand-picked by Formation Capital to hold an executive position at a company owned or controlled by Formation Capital, including Consulate Health Care.

### H.     Formation Capital

76.     Defendant Formation Capital is a limited liability company organized under the laws of the Commonwealth of Pennsylvania on December 22, 1998 and re-domesticated under the laws of the State of Georgia on May 3, 2007. Its principal place of business is 3500 Lenox Road NE, Suite 510, Atlanta, GA 30326. Defendant Formation Capital is a private investment firm that focuses on senior housing and care, post-acute care, and related real estate investments. In 2011, Formation Capital led a group of investors that acquired ownership and control of Defendant Genoa, through their subsidiaries or affiliates Defendants Consulate Health Care and Consulate Management. Formation Capital continues to list Defendant Consulate Health Care, a/k/a LaVie Care Centers, as an "Unrealized" investment within its portfolio. Hillcrest's 2015

Medicaid Cost Report filed with AHCA identified "Formation Capital" as the 100% owner of Hillcrest. *See* Hillcrest 2015 Cost Report at 51. The registered agent for Defendant Formation Capital, LLC is Corporation Service Company, 40 Technology Parkway South, #300, Norcross, GA 30092.

77.     Formation Capital is the ultimate decision-maker that exercises control over the operations of SNFs held by its subsidiaries, including Defendants Hillcrest and Epsilon HCP. Formation Capital selects and oversees the management teams that run the facilities. For example, an industry observer reported shortly after Formation Capital's acquisition of Defendant Genoa in 2011 that "Formation has hired [Defendant] Consulate Management (run by [Defendant] Joe Conte) to manage the properties." *2011 Senior Care Stock Returns*, The SeniorCare Investor, (Jan. 2012), *available at* https://www.levinassociates.com/sites/default/files//pdf/_scipdfs/2012/1201sci.pdf.

78.     Formation Capital exercises direct operational control over the SNFs in its portfolio, including Defendant Hillcrest and other SNFs in the State of Florida. For example, according to an April 24, 2015 SEC filing by Defendant Genesis, in 2014 when affiliates of Defendant Formation Capital privately owned Defendant Genesis and owned Consulate Health Care and Consulate Management, Defendant Genesis entered into approximately 180 agreements with Consulate Management-run SNFs and may have received more than $150 million in 2014 through that arrangement. On information and belief, this arrangement came into being only after affiliates of Defendant Formation Capital acquired Defendant Genoa; previously, a different rehabilitation company, which was not owned by Formation Capital affiliates, had provided services at the SNFs pursuant to service agreements.

29

79.     On its website, Formation Capital describes its executives as "an experienced management team with expertise in healthcare." http://formationcapital.com/aboutus.php. Formation Capital exercises direct control over the operations of its portfolio holdings, including LaVie Care Centers (Consulate Health Care).  It advertises that it creates a specific "business plan for each investment" it holds.  Formation Capital also advertises that it monitors its holdings (which include LaVie Care Centers, *i.e.*, Consulate Health Care, and Consulate Management) through a division called Formation Healthcare Group ("Formation Healthcare").  According to its website, Formation Healthcare is an in-house advisory group "that tracks, trends, benchmarks, analyzes, and reports on the clinical performance and regulatory compliance of operators and their facilities." https://www.formationhealthcare.com/about.  Through its Formation Healthcare division, Defendant Formation Capital obtains "real time facility information" and "on site facility visits" to allow it to monitor the SNFs in its portfolio, including Defendant Hillcrest.  The website further states that Formation Capital creates a "management system" and "provides the platform for" SNFs in its portfolio.  Through this monitoring and active management, Formation Capital was aware of and encouraged the illegal conduct described herein at all relevant times.

80.     Prior to February 2, 2015, Defendant Formation Capital controlled Defendant Genesis through exclusive ownership of the company directly and/or through affiliates.  Since February 2, 2015, Formation Capital has continued to control Genesis through overlapping directorates and officers.  From February 2, 2015 until April 7, 2017, one of Formation Capital's two co-founders, Defendant Steven Fishman, served as Chairman of the Board of Directors of Defendant Genesis.  In addition, since 2015, Defendant Arnold Whitman (the other co-founder of Formation Capital), Defendant Reis (a partner and investor with Formation Capital), and Defendant Hartman (an investor affiliated with Formation Capital), have also served on the

Board of Directors of Defendant Genesis.  According to an April 2017 SEC filing by Defendant Genesis, Defendants Fishman, Whitman, Reis, and Hartman, together with Defendant Neuberger, are the beneficial owners of a majority of the ownership interests in Defendant Consulate Health Care.

81.     The Individual Defendants and Formation Capital rely on and use each of the other Defendants named above to help promote their fraudulent scheme, shield themselves from liability, and divert the proceeds from that scheme in an effort to make enforcement and recovery difficult.  The other entity defendants, and particularly the Landlord Defendants and the Investor Defendants, do not conduct operations independent of Formation Capital, do not exercise independent decision-making authority, and are effectively used for the sole purpose of providing financial support for Formation Capital and the Individual Defendants.

82.     Many of the defendants share offices.  For example, all three Management Defendants, CMC II Investors, Florida HCP, LVE Master Tenant, and LVE Holdco all share the same office in Maitland, Florida.  Defendants FC Encore Hollywood, FC Encore Manager, HCCF, and Defendant Formation Capital all share the same office in Atlanta, Georgia.  Other entity defendants, whose principal places of business are as yet unknown, also likely share those offices.  Similarly, each Individual Defendant is affiliated with multiple entity defendants through overlapping ownership, directorate, and officer structures.

## GOVERNMENT HEALTH INSURANCE PROGRAMS

### A. Health Insurance Through Medicare

83.     The Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program, was established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* (hereinafter "Medicare").  Medicare is a health insurance program administered by the Government of the United States that is funded by taxpayer revenue.  Medicare is

overseen by the United States Department of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services (CMS).

84.     Medicare is designed to be a health insurance program and to provide for the payment of hospital services, skilled nursing services, rehabilitation services and durable medical equipment to persons over sixty-five (65) years of age, and certain other eligible individuals.

85.     Reimbursement for Medicare is made by the United States through CMS, which contracts with private insurance carriers referred to as Medicare Administrative Contractors ("MACs") to administer and pay claims from the Medicare Trust Fund. *See* 42 U.S.C. §§ 1395h, 1395u. In this capacity, MACs act on behalf of CMS.

86.     Medicare does not generally pay for long-term care. However, Medicare Part A will pay for medically necessary services provided by a SNF for up to 100 days to a resident who has been recently discharged from a hospital and is in need of skilled nursing services to recover from hospital treatment. *See* 42 U.S.C. §§ 1395d(a)(2), 1395f(a)(2)(B); 42 C.F.R. §§ 424.20-.36.

87.     Medicare pays for SNF care in two ways: directly, through the Prospective Payment System ("PPS"), or indirectly through Medicare Advantage plans established under Medicare Part C.

**1.     Federal Regulation of SNFs Receiving Medicare Reimbursement**

88.     In the Omnibus Budget Reconciliation Act of 1987 ("OBRA"), Congress imposed a number of requirements on SNFs receiving Medicare reimbursement to protect the rights of residents at such facilities and ensure that they receive appropriate care. *See* Pub. L. No. 100-203, § 4201, 101 Stat. 1330, 1330-160 to 1330-174, codified as amended at 42 U.S.C. § 1395i-3.

89.     Among other things, OBRA requires SNFs regularly to collect and submit to CMS certain information on each resident, which is used to assess the resident's medical condition and the treatment provided to the resident. *See* 42 U.S.C. § 1395i-3(b)(3). This

32

information is reported in a form jointly established by CMS and each State, which is referred to as a Minimum Data Set ("MDS") Assessment.

90.     OBRA requires SNFs to complete and submit to CMS and to the appropriate State agency a comprehensive MDS Assessment for each resident within 14 days of the resident's admission to the SNF, promptly after a significant change in the resident's physical or mental condition, and at least once every 12 months. *See* 42 U.S.C. § 1395i-3(b)(3)(C). More abbreviated assessments must be completed quarterly and upon the resident's entry into, and discharge from, the SNF. *See id.*; 42 C.F.R. § 483.20(c), (*l*).

91.     Each MDS Assessment provides a variety of information about the resident's physical and mental condition and the resident's ability to perform certain activities of daily living ("ADLs") such as walking and eating. *See* MDS Resident Assessment and Care Screening at 6-26, attached hereto as Exhibit 2 ("Ex. 2"). The MDS Assessment also reports the medications, therapy, and/or other skilled nursing services provided to the resident. *See id.* at 27-29.

92.     A registered nurse ("RN") must coordinate the completion of the MDS Assessment, and must sign the MDS Assessment to certify that it has been properly completed. *See* 42 U.S.C. § 1395i-3(b)(3)(B)(i); 42 C.F.R. § 483.20(h), (i)(1); Ex. 2, § Z, at 38. Each individual who completes a portion of an MDS Assessment must sign to certify the accuracy of that portion of the assessment. *See* 42 U.S.C. § 1395i-3(b)(3)(B)(i); 42 C.F.R. § 483.20(i)(2); Ex. 2, § Z, at 38. The MDS Assessment must "accurately reflect the resident's status," 42 C.F.R. § 483.20(g), and should be based on direct observation of the resident's condition or detailed and accurate medical records. These requirements are designed to ensure the integrity and reliability of MDS Assessments.

93.     CMS has promulgated and regularly updates a Resident Assessment Instrument Manual ("RAI Manual"), which provides extensive guidance to SNFs on how to collect and report the information contained in the MDS Assessment.  The RAI Manual is designed "to facilitate the accurate coding of the MDS resident assessment and to provide assessors with the rationale and resources to optimize resident care and outcomes."  CMS, Long-Term Care Facility Resident Assessment Instrument 3.0 User's Manual at 3-1 (Oct. 2017), *available at* https://downloads.cms.gov/files/MDS-30-RAI-Manual-v115-October-2017.pdf.

94.     The primary purpose of the MDS Assessment is to identify resident care needs that are addressed through a care plan developed for each resident.  *See id.* at 1-5.  SNFs are required to use MDS Assessments, which are essentially preliminary assessments, to conduct more extensive Care Area Assessments ("CAAs") for each resident that are focused on that resident's specific problems and needs.  *See id.*  SNFs must use the CAAs and the MDS Assessment to develop a comprehensive care plan for each resident "that includes measurable objectives and timetables to meet a resident's medical, nursing, and mental, and psychosocial needs that are identified in the comprehensive assessment."  42 C.F.R. § 483.20(k)(1); *see also id.* § 483.20(d); 42 U.S.C. § 1395i-3(b)(4).  A comprehensive care plan must be "developed within [7] days after the completion of [a resident's] comprehensive [MDS A]ssessment" and periodically reviewed and revised after each subsequent MDS Assessment.  42 C.F.R § 483.20(k)(2)(i).  Moreover, the care plan must be prepared by an "interdisciplinary team that includes the attending physician, a registered nurse with responsibility for the resident, and other appropriate staff in disciplines as determined by the resident's needs."  *Id.* § 483.20(k)(2)(ii).  SNFs are required "to maintain all [MDS A]ssessments completed within the previous 15 months in [each] resident's active record and use the results of the [A]ssessments to develop,

34

review, and revise the resident's comprehensive plan of care." 42 C.F.R. § 483.20(d).

95.     The CAA process requires SNFs to identify "care areas" that are "triggered" by the comprehensive assessment of a resident's medical condition and needs; evaluate each triggered care area by "doing an in-depth, resident-specific assessment of the triggered condition in terms of the potential need for care plan interventions"; decide what course of care to provide; and document all of these steps in the CAA process. RAI Manual at 4-12 to -15. CMS has prescribed 20 care areas that require a SNF to conduct further evaluation and care-planning, including "ADL Functional/Rehabilitation," which addresses a resident's "potential for improved functioning"; pain; dental care; the need for physical restraints; pressure ulcers; dehydration; nutritional status; and other conditions, symptoms, and areas of concern that are common in nursing home residents and are commonly identified or suggested by MDS Assessment findings. *See id.* at 4-16 to -41. A summary of the resident's care needs and the creation of a care plan is reported in comprehensive MDS Assessments. *See* Ex. 2, § V, at 31-32. SNFs are required to document CAAs and care plans for each resident; these materials must be maintained in the resident's medical records but are not submitted to CMS.

**2.     The Prospective Payment System**

96.     In the Balanced Budget Act of 1997, Congress established a PPS for SNFs, pursuant to which CMS provides advance payments to SNFs for skilled nursing services to eligible residents. *See* Pub L. No. 105-33 § 4432, 111 Stat. 251, 414, codified as amended at 42 U.S.C. § 1395yy; *see also* 42 C.F.R. §§ 413.330, *et seq.*

97.     In establishing the PPS for SNFs, Congress aligned reimbursement rates under the PPS with resident classification and assessment. *See* 42 U.S.C. § 1395yy(e)(4)(G). SNFs receive a predetermined per diem rate for each resident that is calculated based on the medical and physical condition of the resident and the resident's anticipated need for therapeutic and

other skilled nursing services as reported in the resident's MDS Assessments. *See* 42 C.F.R.

§§ 413.335-37, .343. Specifically, each resident is assigned to one of over 50 mutually exclusive

groups, referred to as Resource Utilization Groups ("RUGs"), based on his or her clinical,

functional, and resource-based criteria. *See id.* § 413.333. Payments under PPS depend on the

RUG level assigned to each resident. *See id.* §§ 413.335-37. To receive reimbursement under

Medicare Part A for post-hospital SNF care provided to a resident, a SNF must certify that the

resident "has been correctly assigned to one of the Resource Utilization Groups designated as

representing the required level of care." *Id.* § 424.20(a)(ii). Those RUG levels for each resident

are recalculated on a regular basis.

98.     To receive payment under PPS, SNFs must complete MDS Assessments more

frequently than required by OBRA: MDS Assessments must be completed on approximately the

5th, 14th, 30th, 60th, and 90th days of a resident's stay at a SNF. *See* 42 C.F.R. § 413.343(b);

*see also generally* 42 U.S.C. § 1395*l*(e). In submitting an MDS Assessment, a SNF must select

an Assessment Reference Date ("ARD") as of which information in the MDS Assessment is

reported. The information reported in each field of the MDS Assessment is based on a 7- or 14-

day "look-back" period preceding the ARD. *See* RAI Manual at 2-15. However, a SNF is

allowed some flexibility in setting ARDs. There is a window of four to nine days before each

required MDS Assessment, and a SNF may also use certain specified "grace days" before or

after the prescribed ARD window. *Id.* at 2-43. Thus, for example, the ARD for a 14-day MDS

Assessment can be set as early as the resident's 11th day at the SNF or, through the addition of

grace days, as late as the 19th day. *Id.* Grace days may be added to address "situations when an

assessment might be delayed (*e.g.*, illness of RN assessor, a high volume of assessments due at

approximately the same time) or additional days are needed to more fully capture therapy or other treatments." *See id.* at 2-41.

99. A properly completed MDS Assessment must be submitted within 14 days of the MDS Assessment's ARD in order for a SNF to receive full reimbursement. *See* 42 C.F.R. §§ 413.337(c); 413.343, 483.20; RAI Manual at 2-45. A SNF receives a low, default reimbursement rate for days covered by any MDS Assessment that is not timely received by CMS. These MDS Assessments must contain a RUG level, which is reported in Section Z of the MDS Assessment. *See* Ex. 2, § Z, at 38. The RUG level is determined based on the information concerning ADLs and therapy or other rehabilitative services reported in the resident's MDS Assessment. *See* RAI Manual at 6-3 to -5. For example, the RUG level RUX (Rehabilitation Ultra-High, Extensive Services) is appropriate only for a resident who has an ADL score of 11 to 16, receives 720 minutes of therapy or more per week across multiple therapy disciplines, and requires certain other forms of specialized care. *See id.* at 6-24.

100. The signature page for each MDS Assessment makes clear that the MDS Assessment serves as a basis for payment by Medicare:

> I certify that the accompanying information accurately reflects resident assessment information for this resident and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds. I further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information, and that I may be personally subject to or may subject my organization to substantial criminal, civil, and/or administrative penalties for submitting false information. I also certify that I am authorized to submit this information by this facility on its behalf.

Ex. 2, § Z, at 38. The RN Assessment Coordinator must also provide the date that the MDS Assessment is completed. *See id.*

101.    For example, in 2016, the per diem payments for rural SNFs varied from $822.89 per day for RUG level RUX (Rehabilitation Ultra, Extensive Services) to as low as $200.11 for level PA1 (Reduced Physical Function). *See* https://www.gpo.gov/fdsys/pkg/FR-2016-08-05/pdf/FR-2016-08-05.pdf. Manipulating the RUG level assigned to a resident could thus more than quadruple the per diem payment for that resident.

102.    In addition to being accurately reported on a resident's MDS Assessment, skilled nursing services for which a SNF seeks reimbursement must be reasonable, medically necessary, and consistent with professionally recognized standards of care. *See* 42 U.S.C. §§ 1395y(a)(1)(A); 1320c-5(a). In the context of skilled rehabilitation therapy, this means that the services furnished must be ordered by a physician; consistent with the nature and severity of the resident's individual illness, injury, or particular medical needs; consistent with accepted standards of medical practice; and reasonable in terms of duration and quantity. *See* Medicare Benefit Policy Manual, Ch. 8, § 30, *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c08.pdf.

103.    SNFs bill Medicare-covered services on a Uniform Bill 04 ("UB-04") form, or the electronic equivalent. *See* Medicare Claims Processing Manual Ch. 6, § 30, *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c06.pdf.

104.    The contents of a Form UB-04 for a resident convey information from the MDS Assessment submitted for that resident. Each claim for reimbursement in a Form UB-04 can readily be traced to the RUG level asserted in that MDS Assessment.

105.    For per-diem billing, a SNF enters in field 44 – "HCPCS / Rate / HIPPS Code" – the RUG level assigned to the Health Insurance Prospective Payment System ("HIPPS") code field in Section Z of the resident's MDS Assessment, followed by a two-digit code reflecting the type of Assessment – *i.e.*, a 5-day MDS Assessment, 14-day MDS Assessment, *etc.* – in which the RUG level was reported. *See* Medicare Claims Processing Manual, Ch. 25 at 16, *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c25.pdf. Based on the SNF's location, the RUG level, and the MDS Assessment type, CMS automatically determines the number of days for which reimbursement should be provided and the appropriate per diem rate. *See id.*, Ch. 6, § 30.4.2-.3. For example, the RUG level reported in the 5-day MDS Assessment determines the reimbursement rate for a resident's first 14 days at a facility, the 14-day MDS Assessment determines the rate for days 15 to 30, and so on. *See* RAI Manual at 2-46.

106.    To receive reimbursement, a SNF must submit Form UB-04s on a regular basis, and upon a Medicare-covered resident's discharge, exhaustion of benefits, or decrease in level of care to less than skilled care. *See* Medicare Claims Processing Manual, Ch. 6, § 40. Bills must be submitted, and are processed in sequence. *See id.* § 40-1. Thus, a bill corresponding to a 14-day MDS Assessment must be submitted before a bill can be submitted for a 30-day MDS Assessment, and so on.

107.    The reverse side of each Form UB-04 contains the following certifications, among others:

> UB-04 NOTICE:  THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES

AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).

Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.

### 3. Medicare Advantage Plans

108. In addition to direct reimbursement of SNFs for nursing care, Medicare also permits eligible individuals to cover the cost of skilled nursing care by enrolling in Medicare+Choice Plans or Medicare Advantage Plans ("MA Plans") established under Medicare Part C. Medicare Part C enables private insurers to contract with CMS to establish an MA Plan, which offers individuals eligible for Medicare the same benefits they would receive under Medicare, and may also offer additional benefits not covered by Medicare. *See* 42 U.S.C. §§ 1395w-21, -22.

109. In exchange for covering the costs of prescription drugs and medical or skilled nursing services covered by Medicare, MA Plans receive from CMS a monthly capitation rate for each eligible participant. *See* 42 U.S.C. § 1395w-23; 42 C.F.R. §§ 422.304-.308. The capitation rate is risk-adjusted for each participant based on risk diagnosis data provided by MA Plans to CMS. *See* 42 U.S.C. § 1395w-23(a)(1)(C); 42 C.F.R. § 422.308(c). Additionally, MA Plans are permitted, but not required, to charge a premium to Plan participants, which covers the cost of any additional services offered by the MA Plan in excess of those covered by Medicare. *See* 42 U.S.C. § 1395w-24(b). The majority of participants in MA Plans pay no premium. In practice, the bulk of MA Plans' revenue comes from the CMS monthly capitation payments rather than premiums.

110. In 2016, MA Plans received over $202 billion from CMS. *See* Issue Brief: The Facts on Medicare Spending and Financing (July 2017), *available at*

40

https://www.kff.org/medicare/issue-brief/the-facts-on-medicare-spending-and-financing/. In 2017, MA Plans covered over 19 million people nationwide and over 33% of those receiving Medicare benefits in the United States and over 42% of those receiving Medicare benefits in the State of Florida did so through an MA Plan. Paying for care through MA Plans costs CMS about 10% more on average than direct reimbursement through the PPS. *See* Fact Sheet: Medicare Advantage (Oct. 2017), *available at* https://www.kff.org/medicare/fact-sheet/medicare-advantage/.

111.    Because MA Plans receive federal funds to cover the cost of providing medical and skilled nursing care to insureds, they are subject to substantial regulation and oversight by CMS – including oversight designed to prevent federal funds from being lost to fraud, waste, and abuse. An MA Plan contracting with CMS must agree to establish an effective compliance program to prevent fraud, waste, and abuse. *See* 42 C.F.R. § 422.503(b)(4)(vi). Additionally, HHS is required to provide for the annual auditing of MA Plans, including their level of Medicare utilization and costs. *See* 42 U.S.C. § 1395w-27(d)(1). These requirements help ensure that CMS's risk-adjusted capitation payments to MA Plans accurately reflect MA Plan participants' medical condition and needs.

112.    MA Plans contract with SNFs to provide skilled nursing services for MA Plan participants. Under these contracts, reimbursement is typically based on information reported in the MDS Assessment for each resident, and SNFs must complete an MDS Assessment accurately reflecting the resident's condition to receive payment. A resident's MDS Assessment is used by an MA Plan for the MA Plan's internal reimbursement purposes, and may be used to provide risk diagnosis data to CMS so that CMS can determine the appropriate risk adjustment to the

capitation rate for that resident.  The MDS Assessment thus affects both a SNF's reimbursement from an MA Plan and the MA Plan's capitation payments from CMS.

113.    Among others, one important difference between MA Plans and direct PPS reimbursement under Medicare is that benefits under MA Plans may not require an acute stay. Medicare pays for up to 100 continuous days in a SNF for post-acute care after discharge from a hospital stay of at least three days.  In general terms, a Medicare resident who is discharged from a SNF may return for further SNF care only after another three-day hospital stay, and even then only for the balance of the resident's 100-day coverage benefit.  The 100-day benefit does not reset until the resident spends at least 60 days without receiving any inpatient services.  Many MA Plans waive the requirement for a three-day hospital stay prior to providing SNF coverage. For example, this could mean that a Medicare resident who is discharged from a SNF after a 30-day stay, due to a non-acute decline in function, could benefit from further SNF services 45 days later but would not be able to return to the SNF, whereas an identical MA Plan resident would be able to return and receive more services from the SNF for up to the remaining 70 days of the SNF benefit coverage.

**B. TRICARE**

114.    TRICARE (formerly CHAMPUS) is a federally funded medical benefit program established by statute.  10 U.S.C. §§ 1071-1110.  TRICARE provides health care benefits to eligible beneficiaries, which include, among others, active duty military service members, retired military service members, and their dependents.  *See id.* § 1072.

115.    TRICARE covers the same skilled nursing services as Medicare.  *See* 32 C.F.R. § 199.4(b)(1)(vi).  The regulatory authority implementing the TRICARE program provides reimbursement to health care providers applying the same reimbursement scheme and coding parameters that the Medicare program applies.  *See* 10 U.S.C. § 1079(j)(2), (4).

116.    TRICARE, like Medicare, pays only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i). TRICARE follows Medicare's PPS and RUG level methodology and assessment schedule, and beneficiaries are assessed using the same MDS Assessment form used by Medicare. *See* TRICARE Reimbursement Manual 6010.58-M, Ch. 8, § 2 (Nov. 2017), *available at* http://manuals.tricare.osd.mil/pages/DisplayManual.aspx?SeriesId=REIMBRSMT (further link to Table of Contents at Change 152). Similarly, services provided to a resident covered by TRICARE are billed on the same Form UB- 04 and depend on the RUG levels reported in the MDS Assessment. *See id.*

## C. Health Insurance Through Medicaid

117.    Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*, provides for federal grants to support State Plans for Medical Assistance, and is commonly known as the Medicaid program. Each State has established and administers a Medicaid program to pay for medical and skilled nursing services, durable medical equipment, and prescription drugs for disabled or financially needy individuals, which must conform to certain requirements to receive federal financial support. *See* 42 U.S.C. § 1396a.

118.    The States directly pay providers for services covered by Medicaid, with the States obtaining the federal share of the payment from accounts which draw on the United States Treasury. *See* 42 U.S.C. § 1396b; 42 C.F.R. §§ 430.0-430.30.

### 1.    Federal Medicaid Requirements for SNFs

119.    Federal law imposes a number of requirements on SNFs that participate in a Medicaid program. Specifically, SNFs must provide services pursuant to a written plan of care that is designed to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident. *See* 42 U.S.C. § 1396r(b)(2). If a resident's plan of care calls for

43

rehabilitative therapy, the SNF is required by law to provide the therapy or contract with an outside provider to ensure necessary therapy is provided. *See* 42 C.F.R. § 483.45(a).

120.     In order to develop, review, and revise each resident's plan of care, a SNF is required regularly to complete MDS Assessments for each resident. *See* 42 U.S.C. § 1396r(b)(3)(A), (D). An RN is required by law to conduct or coordinate the MDS Assessment, and must sign the MDS Assessment to certify that it has been properly completed. *See* 42 U.S.C. § 1396r(b)(3)(B)(i); 42 C.F.R. § 483.20(h), (i)(1). Each individual who completes a portion of the MDS Assessment must sign to certify the accuracy of that portion of the MDS Assessment. *See* 42 C.F.R. § 483.20(i)(2).

121.     Like OBRA, Medicaid law requires that MDS Assessments be completed for each resident within 14 days of admission, promptly after a significant change in the resident's physical or mental condition, and at least every 12 months. *See* 42 U.S.C. § 1396r(b)(3)(C)(i). Each resident must be examined at least every three months to determine whether his or her Assessment needs to be updated. *See id.* § 1396r(3)(C)(ii).

### 2.     Florida Medicaid Requirements for SNFs

122.     The State of Florida has established a Medicaid program administered by the Florida Agency for Health Care Administration ("AHCA"). *See* Fla. Stat. § 409.902. Florida's Medicaid program covers nursing and rehabilitative services provided at SNFs. *See id.* § 409.905(8).

123.     AHCA regulates the provision of care by SNFs that participate in Florida's Medicaid program to ensure that residents receive appropriate care. *See* Fla. Stat. § 409.919; Fla. Admin. Code R. 59G-4.200. These regulations are set out in AHCA's Statewide Medicaid Managed Care Long-term Care Program Coverage Policy (Mar. 2017) ("2016 Medicaid Coverage Policy"), *available at* http://www.ahca.myflorida.com/medicaid/review/Specific/59G-

4.192_LTC_Program_Policy.pdf, AHCA's Nursing Facility Coverage Policy (May 2016) ("2016 Nursing Facility Coverage Policy"), *available at* https://www.flrules.org/gateway/readRefFile.asp?refId=6634&filename=Nursing_Facility_Servi ces_Coverage_Policy_Proposed.pdf, and AHCA's Florida Medicaid Nursing Facility Services Coverage and Limitations Handbook (Oct. 2003 & rev. 2004) ("2004 Nursing Facility Handbook"), attached hereto as Exhibit 3. AHCA has incorporated into the Medicaid Coverage Policy all federal and Florida state requirements, including those regulations concerning MDS assessments and care plans. *See* AHCA Coverage Policy Review Presentation (June 16, 2017), *available at* http://ahca.myflorida.com/Medicaid/recent_presentations/SMMC_webinars/FINAL_SMMC_LT C_Program_Coverage_Policy_Presentation_061617.pdf ("We will not recite [in the Medicaid Coverage Policy] the **exact same** requirements that are specified in state statute or in federal regulations unless an interpretation is required to implement[.]") (emphasis in original).

124. Consistent with federal law, AHCA requires SNFs to develop a comprehensive plan of care for each resident, which must include measurable objectives and timetables to meet a resident's medical, nursing, mental and psychological needs. *See* 2004 Nursing Facility Handbook at 2-27; 2016 Medicaid Coverage Policy at 6.2, 1.3.18 (AHCA requires SNFs to develop "an individualized plan of care based upon a comprehensive needs assessment . . . [which must include a] description of the enrollee's goals for long-term care, the services and supports needed to meet those goals, and the specific service needs of each enrollee, showing the projected duration, desired frequency, and type of provider furnishing each service, and the scope of the services to be provided."). The plan of care must be based on the resident's MDS Assessment and must be completed within seven days after completion of the MDS Assessment.

2004 Nursing Facility Handbook at 2-27. The MDS Assessment must be completed within 14 days of the resident's admission to the nursing facility and submitted to CMS. *Id.* The plan of care must be reviewed at least every 90 days by the resident's physician and other personnel involved in the resident's care. *Id.* at 2-28; *see* 2016 Medicaid Coverage Policy at 6.2.2.

125. The MDS Assessment must be kept in the resident's medical file and is subject to inspection and audit by AHCA. Additionally, the information reported in a facility's MDS Assessments (including the summary of care planning in Section V of the MDS Assessment) is maintained in the Quality Improvement and Evaluation System ("QIES"), which is jointly established by CMS and each state, including Florida. Florida has access to MDS Assessment data through QIES and uses these data to assess the quality of services provided by SNFs.

126. The plan of care is central to the nursing services covered by Florida's Medicaid program. Indeed, an AHCA-commissioned independent study of the Florida Medicaid program found that "the lack of an appropriate [plan of care] indicates unmet need (i.e., poor quality)." Independent Assessment of the Florida Statewide Medicaid Managed Long-term Care Program Final Interim Report (FY2014-15) (June 30, 2017) at 71, *available at* http://ahca.myflorida.com/medicaid/Policy_and_Quality/Quality/performance_evaluation/MER/ contracts/med186/MED186_Final_Interim_Report.pdf. Among the basic rights of a resident covered by Medicaid is the "right to receive adequate and appropriate health care and protective and support services, including social services; mental health services, if available; planned recreational activities; and therapeutic and rehabilitative services consistent with the resident care plan." Fla. Stat. § 400.022; *see* 2004 Nursing Facility Handbook at 2-17; *see also* 2016 Nursing Facility Coverage Policy at 1.3.10. In particular, rehabilitative therapy "must be provided by licensed personnel under a physician's written order and included in the plan of

46

care." 2004 Nursing Facility Handbook at 1-6. Accordingly, nursing facilities are required to maintain sufficient "staff to provide 24-hour nursing and related services to residents . . . as determined by resident MDS Assessments and documented in individual plans of care." *Id.* The per diem rate that AHCA pays to nursing facilities is designed to "cover[] rehabilitative and restorative care including physical, speech, occupational, and respiratory therapy ordered by a resident's physician and included in the plan of care." *Id.* at 2-10.

127.    Florida's Medicaid program also requires that Medicaid services be provided in accord with applicable provisions of all Medicaid rules, regulations, handbooks, and policies and in accordance with federal, state, and local law.

### 3.    Reimbursement by Medicaid

128.    AHCA is responsible for reimbursing nursing facilities for services covered by Medicaid. AHCA is empowered to determine appropriate reimbursement rates for nursing facilities, based primarily on the costs reported by each facility. *See* Fla. Stat. § 409.908(2). AHCA analyzes each nursing facility's cost reports and establishes a specific per diem rate for each facility annually, which AHCA calls a "semester."[5] *See, e.g.*, AHCA, Computation of Nursing Home Medicaid Reimbursement Rate, 2017 Semester, (Sept. 1, 2017) at 521-22, *available at* http://ahca.myflorida.com/medicaid/cost_reim/pdf/NH_Rate_Calculations_and_FRVS_Providers _122346-228001_2017-09-01.pdf.

129.    Bills are submitted to the Florida Medicaid program's Fiscal Agent, HP Enterprise Services, which acts on behalf of AHCA in reviewing and paying claims.

---

[5] Prior to September 1, 2016, AHCA established the per diem rate for each facility every six months. *See* http://ahca.myflorida.com/medicaid/cost_reim/nh_rates.shtml.

Reimbursement by HP Enterprise Services is funded with federal and Florida funds. *See* AHCA,

Medicaid Management Information System/Decision Support System/Fiscal Agent Services

Procurement:  Request for Proposal § 30.12 (Mar. 3, 2005), *available at*

http://ahca.myflorida.com/medicaid/Operations/Fiscal/docs/080724_MMIS_RFP_2008-

2013.pdf.

130.    To receive reimbursement for Medicaid-covered services, a nursing facility must

submit a version of the Form UB-04 developed by AHCA.  *See* Fla. Admin. Code R. 59G-

4.003; AHCA Medicaid Provider Reimbursement Handbook, UB-04 at 1-2 (July 2008),

*available at* http://ahca.myflorida.com/medicaid/review/Reimbursement/RH_08_080701_UB-

04_ver1_3.pdf.

131.    The reverse side of a Form UB-04 also contains the following statements (or

substantially similar statements):

> The following certifications or verifications apply where pertinent to this Bill:
>
> \* \* \*
>
> For Medicaid purposes: The submitter understands that because payment
> and satisfaction of this claim will be from Federal and State funds, any
> false statements, documents, or concealment of a material fact are subject
> to prosecution under applicable Federal [or] State [L]aws

132.    AHCA's Medicaid Provider Reimbursement Handbook explains that a SNF

certifies compliance with applicable federal and Florida laws even when a Form UB-04 is

submitted electronically rather than on a signed paper form:

> Because the UB-04 claim form does not have the provider's signature, the
> provider's endorsed signature on the back of the remittance check issued
> by the Medicaid fiscal agent takes the place of a signature on a paper
> claim form.  It acknowledges the submission of the claim and the receipt
> of the payment for the claim.  It certifies that the claim is in compliance
> with the conditions stated on the back of the paper claim form and with all
> federal and state laws.

> Any provider who utilizes the electronic funds transfer system is certifying with each use of the system that the claim(s) for which the provider is being paid is in compliance with the provisions found on the back of the paper claim form and with all federal and state laws.

AHCA Medicaid Provider Reimbursement Handbook, UB-04 at 1-48.

133.    Florida law expressly conditions payment under the Medicaid program on compliance with federal and state regulations, including the regulations concerning care plans and MDS Assessments described above.  Specifically:

> When presenting a claim for payment under the Medicaid program, a provider has an affirmative duty to supervise the provision of, and be responsible for, goods and services claimed to have been provided, to supervise and be responsible for preparation and submission of the claim, and to present a claim that is true and accurate and that is for goods and services that:
>
> * * *
>
> (b) Are Medicaid-covered goods or services that are medically necessary.
>
> * * *
>
> (e) Are provided in accord with applicable provisions of all Medicaid rules, regulations, handbooks, and policies and in accordance with federal, state, and local law.
>
> (f) Are documented by records made at the time the goods or services were provided, demonstrating the medical necessity for the goods or services rendered.  Medicaid goods or services are excessive or not medically necessary unless both the medical basis and the specific need for them are fully and properly documented in the recipient's medical record.
>
> The agency shall deny payment or require repayment for goods or services that are not presented as required in this subsection.

Fla. Stat. § 409.913(7).

## STATE AND FEDERAL FALSE CLAIMS ACTS

134.    The federal FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly

makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B). It similarly imposes liability on any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *Id.* § 3729(a)(1)(G).

135.    The FCA defines "knowing" and "knowingly" with respect to information as meaning that the person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A). The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

136.    The FCA defines a "claim" as "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that –

    (i)    is presented to an officer, employee, or agent of the United States; or

    (ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government –;

        (I)    provides or has provided any portion of the money or property requested or demanded;

        (II)    [will] reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(b)(2)(A).

137.    Accordingly, each MDS Assessment and each Form UB-04 submitted to CMS, MACs acting on CMS's behalf, or other government health programs constitutes a "claim"

within the meaning of the FCA, because these documents are designed to induce, and do ordinarily induce, the payment of money by CMS. Additionally, each MDS Assessment is a record or statement that is material to a Form UB-04.

138.    However, as the FCA makes clear, requests for money submitted to a federal grantee, contractor, or other recipient may also constitute a claim, if money requested is being spent to advance a Government purpose and a portion of the money is provided by the federal government. Thus, each Form UB-04 and each MDS Assessment submitted to AHCA or Fiscal Intermediaries acting on its behalf – and each request for reimbursement and each MDS Assessment submitted to an MA Plan – constitutes a "claim" within the meaning of the federal FCA. Further, each MDS Assessment constitutes a record or statement material to a Form UB-04 or other request for reimbursement.

139.    The Florida False Claims Act, Fla. Stat. § 68.081, *et seq.*, is substantially similar to the FCA, and also imposes civil liability on any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval" or who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim." Fla. Stat. § 68.082(2)(a)-(b). As does the federal FCA, the Florida False Claims Act imposes liability on any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly improperly avoids or decreased an obligation to pay or transmit money or property to the state." *Id.* § 68.082(2)(g).

140.    Each Form UB-04 submitted to AHCA is a "claim" within the meaning of the Florida False Claims Act, and each MDS Assessment submitted to CMS or TRICARE and

accessible to AHCA is a record or statement that is material to such claims. *See* Fla. Stat. § 68.082.

## DEFENDANTS' SCHEME TO DEFRAUD MEDICARE, MEDICAID, AND TRICARE

141.    Defendants engaged in a scheme to defraud Medicare, Medicaid, and TRICARE by submitting and causing to be submitted numerous false or fraudulent statements and false or fraudulent claims that contained fraudulently inflated RUG levels and that falsely represented that care was being provided in accordance with contemporaneously established care plans and physician certifications.  Each of the Defendants knew, or was deliberately ignorant or reckless in not knowing, that the claims and statements generated by these improper practices were false or fraudulent.  Defendants nevertheless persisted in their fraudulent scheme because it generated millions of dollars in reimbursements from federal and Florida funds.

### A. Relator's Knowledge of the Fraudulent Schemes

142.    Relator was employed and supervised by Hillcrest and management personnel of Defendants Consulate Health Care and Consulate Management (together, "Consulate"), and she directly witnessed actions that would cause the creation and submission of numerous false statements and claims for Medicare and Medicaid reimbursement.  The description of the fraudulent activity below is based on her personal knowledge.

### 1.    Provision of Unnecessary Medicare Services to Increase Medicare Billing

143.    Relator was present for an "MDS Boot Camp" put on by Consulate's regional management on or around March 23, 2017.  At this "Boot Camp" Relator and all employees present were instructed that, when evaluating SNF residents for mood and depression, they are to find that each resident has at least four indicators of depression for purposes of MDS Assessment, because if four or more depression indicators are coded on a resident's MDS Assessment, Defendants' facilities receive an extra $80 per day in Medicare reimbursement.  As

52

part of the Boot Camp, Relator and all those present were instructed on how to present the evaluation questions to residents in a manner that would lead them to answer "yes" to the questions, so that there would be at least four positive indicators for mood and depression (and higher reimbursement). The Consulate regional employees in charge of the MDS Boot Camp were Maria Seger-Cramer and Janice Chesser.

144. Janice Chesser is Consulate's regional MDS director. In that role, she supervises the MDS nurses in each facility within her region. Chesser pressed employees to code for high RUGs, in order to inflate reimbursement.

145. Maria Seger-Cramer is Consulate's Regional Vice President ("RVP"). Like Chesser, she pressed employees to code for higher RUGs in order to inflate reimbursement.

146. At the MDS Boot Camp, as well as on various telephone conferences with Hillcrest staff and Consulate management, Relator received instructions on how to increase Medicare reimbursement for both nursing care and other services provided to residents. If a resident is reported as showing impaired cognition, the resident will receive more medications and additional care, for which Defendants are paid more. Employees, including Relator, were instructed to use a word recall test to measure cognition in order to decide whether a resident should receive a psychological evaluation. In this way, Defendants work to tilt the playing field to show impaired cognition. For example, Elsie Justilien, Hillcrest Executive Director ("ED") until December 2017, told Relator that a resident had a Brief Interview for Mental Status ("BIMS") score of 13 out of 15, where 15 is perfect score. Relator confirmed that the BIMS score was correct and that a psychological consultation was therefore not indicated, but Justilien nevertheless gave instructions to the Hillcrest Unit Manager to call in a psychiatrist to evaluate the resident and the psychiatrist put the resident on psychiatric medications. This action meant

that the resident could remain on Medicare, despite the fact that the resident did not require further therapy.

147. The improper billing and mistreatment of residents is known and encouraged by Consulate management. At the Boot Camp, Relator heard from employees from various Consulate facilities that MDS employees at all facilities have been asked by Consulate to do illegal things, and there is high turnover as people are leaving because they do not want to go to jail.

148. Relator has observed that this type of effort to promote overbilling of Medicare has repeatedly impacted residents. In Utilization Review ("UR") meetings held every Wednesday, Hillcrest rehab therapists discuss how residents are doing with ADLs, such as walking, transfers, and toileting, and the nursing staff discuss residents' nursing needs. When a resident has recovered to the point of no longer requiring therapy, management focuses the discussion on how to keep "skilling" the resident for additional services so that the resident can be held at Hillcrest for further treatment and billing to Medicare. For example, residents without strong appetites are targeted for speech therapy, psychiatric evaluation and or medication.

149. This focus on coming up with a reason to bill more to Medicare extends to residents who do not wish to participate further in therapy. Residents have the right to refuse therapy and will not qualify for Medicare (or the higher Medicare payments) if they choose not to engage in therapy. When a resident is not participating in therapy, the discussion in the Hillcrest UR meetings include whether a psychiatric evaluation is in order to prescribe medications (which would support continuing Medicare payments) or whether pain medication should be prescribed to keep the resident involved in therapy.

150.    The push to force therapy on residents (even if they object to it because of pain) is so great that a "pain management" doctor, Chane Price, participates telephonically in every UR meeting and is asked to evaluate any resident who has declined therapy.  Although he is not the medical doctor for many residents (nor is he affiliated with Hillcrest), by participating in the UR meetings, he hears confidential (HIPPA-protected) information about every resident discussed during the meeting, including details about their diagnoses and medical history.

151.    Consulate management, including Regional Director of Admissions Joanne Alvarez and Regional Nursing Director Peggy Moses, have been at UR meetings and have witnessed these discussions, without any objection.  Accordingly, Consulate is aware of these efforts to artificially increase Medicare billing with disregard for residents at Hillcrest, and on information and belief, Consulate employees and officers have observed similar discussions at other Consulate facilities.

152.    Relator has also observed that when Medicare residents are first admitted, the facility and the rehab department will try to get the resident into the highest RUG level possible, regardless of what the resident might actually need.  The facility will then try to keep the resident in one of the highest billing RUG levels until the expiration of the resident's 100 Medicare-covered days.  After the 100-day benefit coverage expires, if the resident does not discharge, Relator has observed that the facility and the rehab department will typically cease the therapy and provide only "restorative nursing."  Restorative nursing is provided by certified nursing assistants ("CNAs"), not licensed therapists, and is typically used to avoid decline in skills rather than to rehabilitate existing skills that may have deteriorated.

153.    Two MDS Coordinators working at Hillcrest, Verna Chambers and Sophrine Brown, have also stated that Consulate corporate supervisors, including Janis Chesser, pressured

them to code residents into higher RUG levels than supported by their medical conditions.

154.    The rehabilitation department also pushes to get residents into higher RUG levels by providing unnecessary therapy.  For example, a large portion of residents who arrive at the facility are ordered physical therapy five times per week for six weeks, regardless of the reason why they have been admitted.  For example, Relator recalls one resident asking why she was receiving physical therapy when she had been admitted for IV care.

### 2.    Retention of Residents for Additional Days to Increase Medicare Billing

155.    The Consulate facilities also retain residents for longer than necessary in order to receive more days of compensation from Medicare.  Relator has personal knowledge of residents who have met their level of rehabilitation and are ready for discharge but the facility has kept them longer, in order to receive as many of the 100 days of Medicare payment as possible.  The ED will not accept that a resident should be discharged at less than 100 days and will stretch to find any reason to further "evaluate" the resident in order to make them stay longer and in the hopes of coming up with some excuse to retain the resident for longer.

156.    For example, the ED has required that employees evaluate residents who were ready to go home for cognition issues.  In situations where a resident was not eating all his meals, the ED would demand that the resident be evaluated by a speech therapist for swallowing issues.

157.    Likewise, any resident capable of walking 500 feet should generally be discharged.  However, at Defendants' facilities, if the resident has used less than 100 days of Medicare reimbursement, the ED would interject questions about pain management, or order a pain management analysis, in order to find some reason to retain the resident.

158.   Director of Rehabilitation ("DOR") Russell ("Ross") Tolliver, an employee of Defendant Genesis, has agreed with and cooperated with the ED's instructions to retain residents until their 100 Medicare-payment days have expired.

159.   These types of evaluations ordered by the ED and DOR were ruses in order to increase Medicare funds received by Defendants, and were contrary to regular instructions for resident discharge.  The overall goal is to get every resident to 100 days, regardless of care needed, in order to maximize reimbursements.  Relator observed repeated instances of this practice, which was sometimes identified by the statement, "let's ride it out," meaning to retain a resident who should be discharged.  Consulate and Genesis management also occasionally referred to this practice as "shutting the back door" to maintain a high census.

160.   Consulate corporate supervisors also drove the practice of retaining residents for extra days to obtain more revenue.  Janis Chesser, the Consulate regional MDS supervisor, would come to the individual facilities, including Hillcrest, to find ways to extend the stays of Medicare residents who were set to discharge before using their 100 days.  Without evaluating the residents themselves, Chesser would look for reasons in the resident's records to justify keeping the residents in the facility longer, even though discharge was already scheduled.  In Relator's experience, Chesser always invented a reason to keep residents longer in every case she looked at.

161.   Similarly, even after doctors had written discharge orders for residents, Joanne Alvarez, another Consulate regional supervisor, along with Miriam Pastor (Consulate RVP of Operations) and Julia Medina (Consulate Director of Business Development) would pressure facility employees to keep the residents.  In biweekly telephone calls, they would often ask, "Can we extend the days?"

162.     Facility managers also threatened employees' jobs if they refused to try to keep residents beyond a planned discharge date.  In one case, Relator arranged for a resident to be discharged to hospice care based on the request of the resident's family.  At the time, the resident was receiving rehabilitative therapy and was in a high-paying RUG level.  Carmen Telot, the facility ED at the time, told Relator, "Do you want to lose your job?  Call them back and tell hospice to wait until rehab is done."  In another case, the Facility ED, Elsie Justilien, told Relator, "If we don't keep the census up, we can all lose our jobs."  In another case, a resident was denied hospice until after skilled services (the Medicare stay) was completed, based on Justilien's instructions.

163.     For example, Hillcrest "rode out" elderly, terminal resident E.P.'s 100-day SNF benefit.  This resident was admitted to the Hillcrest facility on or around January 10, 2017.  Between January and April 2017, Hillcrest submitted (and Defendants caused to be submitted) one or more false claims to Medicare for this resident.  Defendants' employees knew that this resident suffered from a terminal illness and would not likely benefit from skilled therapy.  However, Defendants' employees provided her with enough therapy to receive reimbursement at the highest RUG levels ("Ultra" and "Very High") for *exactly* 100 days – the entire benefit period – before discharging her to receive hospice care on April 19, 2017.  The false claim(s) were based on MDS Assessments completed for this resident on or around January 16, 2017, January 23, 2017, February 6, 2017, March 8, 2017, March 15, 2017, March 20, 2017, and April 7, 2017.

164.     On January 10, 2017, one day after this resident was admitted to the Hillcrest facility, one of her therapists noted that the resident was "a[n] 81 y/o female with significant h/o of dementia . . . noted to have pneumonia . . . noted to have lung mass also . . . [and] has shunt

for draining fluid in the brain that goes from her head to drainage near her stomach." The resident was nevertheless provided with as much therapy as she could tolerate, so as to enable Hillcrest and Defendants to bill CMS at the highest RUG levels. It was not until the 99th day of her benefit-period stay at Hillcrest, on April 18, 2017, that the resident's treating physician, Dr. Cleopatra Gordon-Pusey, recommended that this "81 y.o. lady with h/o metastatic lung cancer" be discharged for hospice care. The resident was discharged the very next day – the 100th day of her stay, and the final day Hillcrest would receive payments for the resident's treatment under Medicare Part A. The resident died less than one week later.

165.    The MDS Assessments submitted to CMS were false and fraudulent, because they reported therapy minutes that were not necessary given this resident's age and terminal illness, and because they contained RUG levels that did not accurately reflect the actual amount of therapy needed by the resident. While the MDS Assessments did not "accurately reflect the resident's status," 42 C.F.R. § 483.20(g), Defendants' employees signed the MDS Assessments, falsely certifying that they were accurate. See 42 U.S.C. § 1395i-3(b)(3)(B)(i); 42 C.F.R. § 483.20(i)(2); Ex. 2, § Z, at 38. The bills submitted to CMS for this resident were likewise false because they contained the fraudulently inflated RUG levels reported in those MDS Assessments. Defendants' employees knew, or were deliberately ignorant or reckless in not knowing, that these MDS Assessments and resulting bills were false.

166.    The MDS Assessment completed and sent to CMS on or around March 8, 2017, was coded RUG Ultra "RUB" and signed and certified by Defendants' employees "TCYELLEN" and "VCHAMBERS1." The MDS Assessment completed and sent to CMS on or around April 7, 2017, was coded RUG Very High "RVB" and signed and certified by Defendants' employees "TCYELLEN." At least two specific Defendant employees:

"TCYELLEN" and "VCHAMBERS1," caused at least two falsified MDS Assessments to be submitted to CMS.

167. This scheme also included refusing to release residents. Another Hillcrest resident, J.B., had family who wanted Hillcrest to discharge him in 2015. The family stated that this resident was being kept in Hillcrest against his will. At the time, the resident was still on rehabilitative therapy and was in a high RUG level for Medicare reimbursement. The resident's son requested discharge by email on November 8, and that email was viewed by Consulate's Associate Corporate Counsel, Gabriel Strine. To avoid discharging the resident (in order to maintain the Medicare census, including J.B. at a high Medicare RUG level), then-facility ED Kathleen Hawk ignored the discharge request for days. When the resident's son became angry at Hillcrest's refusals to discharge his father, Hawk sent Facility employees to look at the resident's home with the intention that they report that the resident's home presented some "safety issues," as an excuse for the Facility's failure to release the resident upon request. The MDS Assessment and claims submitted to CMS for this resident during the period that Hillcrest refused to discharge the resident were false and fraudulent, because they did not "accurately reflect the resident's status." 42 C.F.R. § 483.20(g). The MDS Assessments represented that this resident needed therapy that he did not in fact need or want. As a result, the RUG levels reflected on the MDS Assessments were inflated. The claims submitted to CMS for this resident were likewise false because they contained the fraudulently inflated RUG levels reported in those MDS Assessments. Hillcrest's management participated in the scheme to hold this resident against his will and provide unnecessary treatment, and knew, or were deliberately ignorant or reckless in not knowing, that the MDS Assessments and resulting bills were false.

168.    Resident J.B. was finally discharged on November 17, after his son's repeated complaints. Relator understood that resident J.B. was being held against his will and that the home visit was a ruse to cover the failure to release him, which Hawk only implemented when it was clear the resident's son would not relent in seeking his father's release.

169.    Accordingly, on or around November 2015, Hillcrest submitted (and other Defendants caused to be submitted) one or more false claims to Medicare for this resident. The false claims were based on MDS Assessments completed around that time which indicated that the resident was still receiving necessary rehabilitative therapy at a high RUG level for Medicare reimbursement, despite the resident's repeated requests to leave the facility.

170.    The Facility's efforts to artificially lengthen residents' stays have been ongoing for years. Corporate management has been involved in these efforts. An October 9, 2013 email reflects that Facility employees were required to report to the Consulate Regional Vice President about the daily discharges. The communication reflects that the facility was required to explain and justify any discharges, and also attempted to convince residents to stay longer and held them despite requests to be released.

171.    Around the same time, on October 10, 2013, Joanne Alvarez, Consulate Regional Director of Admissions for Southeast Florida, berated Hillcrest employees in an e-mail that also went to Consulate Regional Vice President Frank Phillips, saying "5 Medicare discharges in one day . . . We need to have better control of our Medicare Discharges. We can NOT have 3 or more schedule the same day," on a day when three residents went home as planned and one resident expired. Alvarez asked to know what happened.

172.    Hillcrest Assistant ED Dennis Siegel explained that "we actually got additional billable Medicare days by convincing the families to keep them here longer than their requested

discharge dates," referring to residents B.N. and E.J..

173.     The pressure to keep Medicare residents from leaving Defendants' facilities continued in 2014.  For example, Regional Vice President Miriam Pastor asked Hillcrest employees in one email from March 27, 2014, "Why are we having 3 Medicare discharges today team?[] I need a complete recap with facility efforts for those 3 . . . ."

174.     These efforts were not confined to Hillcrest.  Pastor required all facilities in her Southeast Florida region to "control the back door" by keeping residents in the facilities.  In March 2016, Pastor asserted that all employees needed to be involved in the efforts to force census growth: "This is not a function for the ED or DOA only, it is a team effort at the center level and we must get together and strategy's [sic]."

175.     Pastor further warned employees: "You need to be all over this . . . 8 admissions and 33 discharges.  We cannot sustain these numbers . . . we need the team to pull together, work the business, manage the discharges, and keep the residents we do have in house."  She said she would have calls with the team on the issue and would "expect some solid results this weekend [of March 12 & 13, 2016] and throughout the week."  Pastor also stated that she would "re-start FOCUS CALLS with centers below budget/skill mix" in order to pressure employees to push Medicare services on residents.

176.     Pastor also required participation of the Southeast Florida facilities in marketing meetings about "Territory Management," which included discussions about pushing Medicare A services and disenrolling families from HMOs to pick up Medicare A.  The goal was to generate Medicare A revenues, not care for residents: "We must review all planned discharges and assure there is nothing else Therapy or Clinical can do."

177.    Pastor's pressuring of Southeast Florida facilities in March 2016 came directly from Consulate's Vice President of Admissions and Business Development, Patricia Washington.  Washington monitored census at Hillcrest and other Consulate facilities in detail, and put pressure on all Regional Vice Presidents, including Pastor, to increase the Medicare revenues at their facilities.  Washington, for example, in one weekly email to Regional Vice Presidents, called out the facility as "the biggest offender in volume in and out," and praised the Southwest Florida region because "they shut the BACK door!"

178.    Washington implemented various requirements for all the regions to increase Medicare billing, including that the "Regional team [m]ust be in the loop on [a]ll skilled denials," – *i.e.*, if a facility's professionals concluded that a resident did not require skilled services or therapy, the Corporate Regional Team (including Regional Vice Presidents) was to be informed, so that they could override the decision in order to increase Medicare revenues.

179.    In addition, Washington declared that "Centers off plan [*i.e.*, not meeting the budget established by the Corporate owners] should be having strategic focus calls and visits.  I will assist with same."  The "strategic focus calls and visits" were a means of putting pressure on all the facilities in Florida to artificially increase Medicare billing.

180.    Washington also required that the facilities "Set goals to increase conversion ratio's," so that more residents would be flipped in order to increase revenue.

181.    Washington emphasized, "WE MUST manage the Back Door what is the LOS on the centers off plan?[]"  The term LOS refers to Length of Stay.  Washington demanded that all facilities that were under budget increase the number of days residents were held in order to increase revenues.

182.    In addition, Hillcrest and the other of Defendants' facilities were required to

report all discharges to Consulate management, such as Joanne Alvarez, Regional Director of

Admissions for Southeast Florida, and to discuss all discharges with Consulate management on

regular calls so that discharges could be monitored and residents held at the facilities to increase

Medicare billing.

183.    Pressure to retain residents was common.  For example, on May 26, 2015, Joanne

Alvarez emailed several individuals, including the Hillcrest ED, Genesis Rehab Manager

Anjanette Wilson-Reece (who was also Director of Rehab at Hillcrest), Genesis Rehab

Coordinator Terri-Ann Henry, and Consulate Regional Vice Presidents, among others, to ask,

"Any chance we can hold Friday discharge??" for Hillcrest.  Alvarez was requesting that

Hillcrest come up with some reason to hold two Medicare residents (G.H. and G.V.) longer than

required in order to obtain extra billing, likely to meet monthly budgets.

184.    Every discharge was met with pressure from management to explain "what is

going on" with the resident and demands to figure out what "else can be done" for the resident so

they would not be discharged.

185.    The Genesis Defendants participated in the efforts to increase Medicare revenues

for Hillcrest and Defendants' other facilities by extending the stay of residents beyond the

appropriate discharge date.

186.    Until the beginning of 2017, Relator attended periodic UR meetings that were

used to strategize on extending resident stays.  The UR meetings were attended by the Hillcrest

ED, the Assistant ED, the Business Office Manager ("BOM"), the MDS coordinator, the Genesis

Director of Rehab, and each unit head.  During the UR meetings, the rehabilitation department

discussed each resident's status and the number of minutes of therapy that have been provided to

each resident.  These data determine a resident's RUG level and payment amount.  If it appeared

that a resident would get discharged soon, the officials at the meeting would look for ways to avoid discharging the resident. In other words, they sought excuses to keep residents at the facility, regardless of the resident's desire and ability to be discharged. Relator complained at these meetings that this approach was improper, but the practice of manufacturing reasons to retain residents who should be discharged has continued.

187.   Follow up from the UR meetings included additional pressure from Consulate management. For example, on Wednesday, May 21, 2015, five minutes after receiving an email "Update from UR meeting held today" at Hillcrest, Pastor demanded an explanation of "the circumstances related to such a short LOS [length-of-stay] for the 13 day going home today," referring to a Medicare resident who had been at Hillcrest for 13 days. As it turned out, the resident was ordered to have been discharged two days earlier (on Monday), and was walking 300 feet without any assistive device, but because of the budget pressures imposed by management, Hillcrest staff had convinced the resident to remain for two more days, despite the doctor's order to discharge the resident on Monday.

188.   Weekly (and even daily) reports on discharges were routinely sent from Hillcrest and other facilities to Alvarez, as well as Regional Vice Presidents Pastor, Chesser, and Phillips, so that they could put pressure on employees to extend the stay of Medicare residents to increase billing.

189.   Alvarez also held discharge calls to closely monitor discharges in real time to ensure that Medicare residents were held longer in order to increase billing. As notes from the July 23, 2015 call indicate, at least one Medicare resident, J.G. had been extended from discharge at 76 days to 100 days. These calls also addressed flippers, which is another form of Medicare fraud discussed further below.

190.    In early 2017, after Relator and others explained that the residents did not want more therapy and wanted to be discharged to their homes, Consulate, Genesis, and other management employees stopped stating the amount and minutes of therapy provided to the residents at the UR meeting and refused to provide it upon request. Now that therapy minutes are not disclosed, there is more room for manipulation of those minutes to ensure that the high RUG levels required are met, without disclosing their fraud to Relator and others.

191.    Before 2017, the therapy provided to Medicare Part B residents was also discussed at the UR meetings. Beginning early in 2017, Medicare Part B therapy is no longer discussed in UR meetings, except to report when residents are reaching the end of skilled services.

### 3.    Differential Treatment of Medicaid Residents

192.    In stark contrast to these efforts to maximize Medicare reimbursement by forcing residents to undergo the highest levels of therapy and to stay in their facility until their Medicare coverage expired, Defendants have taken, and continue to take, the opposite approach with Medicaid residents, whose per-diem payments are much lower. Unlike their approach to Medicare residents, Defendants do not look for reasons to give Medicaid residents rehab therapy, and ordinarily provide, at most, restorative nursing services only unless a resident's family complains and requests therapy. In at least one instance, obtaining necessary therapy for a resident, T.R., required the family to engage a health ombudsman and even this has only been partially successful in obtaining for the resident the necessary therapy that should be provided under Medicaid.

193.    This is not an isolated instance. Relator estimates that about half of Hillcrest's Medicaid residents may not be receiving the therapy services they require. Hillcrest nevertheless

accepts full payment from Medicaid for these residents and does not inform Medicaid that required services are not being provided.

194.    When discussing upcoming discharges during weekly discharge calls, the corporate supervisors would not ask the facilities to come up with ways to avoid discharging Medicaid residents (unlike Medicare residents).

195.    Indeed, AHCA filed an administrative complaint against Hillcrest for precisely this behavior.  After conducting a licensure complaint survey on June 19, 2015, AHCA "determined that the facility failed to obtain physician orders to provide care and services for a [Medicaid] resident who was assessed upon admission as at risks for falls."  [Hillcrest Settlement and Final Order]  Because this resident's "payor source" was Medicaid, and Hillcrest (and Defendants) only stood to receive a low per-diem flat rate for the resident's stay at the facility, the resident was not provided a care plan to address his fall risk.  As a result, "the resident died on 5/28/2015 from fall injuries."

196.    Hillcrest's actions caused false claims to be submitted to the United States and the State of Florida.  In one case, Hillcrest failed to provide any treatment whatsoever beyond basic restorative nursing services to Medicaid resident D.Q..  As a result, on or around April 17, 2017, this resident was found dead in her room at the facility, sitting on the floor with her back against her closet.  On or around April 2017, Hillcrest submitted (and Defendants caused to be submitted) one or more false claims to Medicaid for this resident, who was not provided with the reasonable and necessary care required to prevent her decline and ultimate death.  Hillcrest's management (as well as Consulate and other Defendants) knew, or were deliberately ignorant or reckless in not knowing, that bills for this resident's treatment were false.

197.     Similarly, while Consulate and Genesis management expected employees to figure out a way to "ride out" the 100-day payment allotment for Medicare residents and to "flip" MA Plan residents, the discharge of Medicaid residents as soon as possible regardless of their medical condition was encouraged.  Justilien, as well as the DOR and BOM at Hillcrest, would refer to Medicaid residents as having "no payor source."

198.     Medicaid residents also suffered from a lack of care at Hillcrest, as evidenced by recurring health situations, including development of pressure ulcers.  To cover up these conditions, Hillcrest employees falsified reports regarding the condition of residents.  For example, on the quarterly MDS Assessment of Hillcrest resident R.P., submitted on or around February 9, 2017, Hillcrest employees reported that R.P. had no unhealed pressure ulcers.  By March 27, 2017, per another MDS Assessment, however, as of the prior MDS Assessment, R.P. had two unhealed Stage 3 pressure ulcers, and one unhealed pressure ulcer that was "unstageable . . . due to suspected deep tissue injury in evolution."  The March 27, 2017 MDS Assessment falsely reported that these pressure ulcers were "present upon admission/entry or reentry," as if they had not occurred at Hillcrest.

199.     Medicaid requires SNFs to provide accurate quarterly reports regarding residents. In the case of R.P., and other residents, Hillcrest staff knowingly falsified such reports in order to avoid providing the information required by Medicaid, but accepted payment anyway.  The motive for that falsification was to avoid drawing attention from AHCA that could lead to severe financial losses via fines, denials of payment, or even facility shutdown.

200.     Defendants also refuse to follow rules that permit Medicaid residents to return after a short discharge to the hospital from a facility.  Under Medicaid rules, a SNF is required to maintain an eight-day "bed hold" allowing a discharged resident to return.  Hillcrest, at

Consulate's instruction, does not follow this rule. In one case, Medicaid resident, C.P., was discharged to Memorial Hospital and asked to return to the facility within a week of her discharge. The ED refused to allow the resident back. Despite the Medicaid requirement, Justilien would not permit C.P. to return to the Facility, and instructed that the hospital be told "we have no bed," although there was a bed available for C.P. Justilien took this action so that Hillcrest could avoid using a bed for Medicaid resident C.P. and avoid the hospital reporting Hillcrest to AHCA for dumping a resident. On information and belief, this practice is consistent in other Consulate facilities.

### 4.  False and Fraudulent Recordation of Therapy to Increase Medicare Billing

201.    Defendants Genesis and Consulate also participate in overstatement of therapy charges to increase revenues.

202.    This overbilling starts from when residents arrive at Hillcrest. In Relator's experience, every new resident coming in to Hillcrest is scheduled for physical therapy and occupational therapy five times per week for the first five or six weeks of the resident's stay. This therapy is scheduled to obtain higher RUG levels for billing purposes regardless of resident condition. On information and belief, this is also the case at other Consulate facilities, because Genesis also provides therapy services at those SNFs.

203.    One therapist, employed by Genesis, told Relator that DOR Tolliver instructs therapists not only to perform group therapy for a number of residents at the same time, but to code the service provided as individual therapy for each resident, in order to obtain the higher reimbursement amount provided for individual therapy for each resident. Under Medicare rules, time spent in group therapy is divided among the members of the group; for example, each resident in a three-person group therapy session lasting 60 minutes would be credited 20 minutes of therapy time. Tolliver's instructions were to misrepresent the amount of time credited by

69

giving each resident 100% of the group minutes; in the previous example, for instance, each resident would be falsely reported to have received 60 individual minutes of therapy.

204.    The same therapist also told Relator that she had provided 15 minutes of therapy to one resident and recorded the session as such, but that the therapist later saw that the amount of time listed in the resident's records had been changed from 15 minutes to 60 minutes.  When the therapist asked Tolliver about the discrepancy, Tolliver stated that he changed the amount because he personally provided additional therapy to the resident to justify the increased amount. The therapist told Relator that she knew Tolliver had not actually provided that additional therapy.  Even if he had provided therapy, Tolliver could not permissibly bill for that time because he is not a licensed occupational therapist.  Instead, he is only an occupational therapy assistant (Florida license #OTA10631).  Therapy must be provided by or under the direction of a licensed therapist to be billable to federal programs; therapy provided by an occupational therapist assistant who is not acting under the direction of a licensed therapist cannot be billed.

205.    In fact, it is unusual for an individual who is not licensed as a therapist, such as Tolliver, to hold a position as a DOR, because the DOR supervises licensed therapists.  Tolliver came to the Hillcrest facility as the DOR in or about April 2016, and had worked for Genesis prior to that time.  After he arrived at Hillcrest, Tolliver boasted to other employees that he knew members of top management at Genesis and did not even need an interview to get his position.

206.    Tolliver has been the subject of at least four complaints of misconduct filed by his subordinates. Relator understands that those four complaints were supposedly investigated in some manner, but that none of the Defendants chose to take action against Tolliver.  Several of Tolliver's subordinates have told Relator that Tolliver has prior criminal convictions on his

record and owns guns, and that they are afraid of physical retribution from him.  On information and belief, Tolliver has a prior arrest record for domestic violence involving a firearm.

207.    As one example of pressure placed on Hillcrest employees when a resident was evaluated as not requiring therapy, on June 5, 2015, after an evaluation, Hillcrest Rehab Manager Anjanette Wilson-Reece concluded that resident J.D. was "not appropriate for therapy services at this time."  Her conclusion was promptly questioned by Jacinthe Montoban, Lead MDS Coordinator at Hillcrest, who suggested that Speech Therapy should evaluate him because "he may have some type of swallowing problem."  She was thereafter informed that resident J.D.'s medical condition precluded offering therapy for swallowing, but this example illustrates the type of pushback all employees received in order to meet Consulate budgets.

### 5.    Flipping of Medicare Advantage Residents to Increase Medicare Billing

208.    Consulate and Genesis Defendants also rely on a practice they call "flipping." Residents covered by MA Plans are entitled to switch from MA Plans to Medicare at their option by submitting a disenrollment request.  If a resident disenrolls from a MA Plan, Medicare may begin paying for the resident's coverage on the first day of the next month.

209.    As SNF residents covered by MA Plans improve in function and approach readiness to discharge, it is rarely in their interest to disenroll from their MA Plans.  This is because the MA Plans typically provide some protection against a post-discharge decline in status and can allow the residents to return to the SNF after discharge if needed, using the balance of their 100-day SNF coverage benefit.  If a SNF resident covered by MA Plans disenrolls and relies on Medicare, that resident would not be able to return unless he or she suffers from an acute incident resulting in a three-day hospital stay.

210.    While SNF residents approaching discharge ordinarily do not stand to benefit from disenrolling, Defendants benefit when residents are disenrolled.  MA Plans are typically

71

administered by HMOs or insurers, which provide a doctor independent of the SNF to determine whether continued SNF care is needed. For residents covered under Medicare, however, no such independent oversight exists, and Defendants can improperly fail to discharge residents in order to continue receiving high per-diem payments for the remainder of the resident's 100-day benefit. For example, if an independent doctor were to evaluate a resident and order a discharge after 25 days in the Facility, Defendants stand to receive payments for an additional 75 days that they would not otherwise get by convincing the resident to disenroll and remain in the Facility. This is part of Consulate and Genesis Defendants' practice of "riding out" residents' 100-day SNF care benefit.

211.    The practice of flipping is similarly based on revenue considerations (and not for the benefit of the residents). Resident records are regularly reviewed to see who could flip and employees are required to regularly report to Consulate management about residents who are eligible to flip and to justify the reason a resident eligible to flip was not flipped.

212.    It is plain that the flipping occurs primarily for purposes of facility revenue (not resident care). An April 28-29, 2016 e-mail chain from Justilien to various Hillcrest employees makes this clear. Justilien first instructed the employees to "see if we can get at least 4 out of 5 [residents] flipped," and in a follow-up email, stated "flipping these patients will help stabilize our census."

213.    For several years, Consulate regional supervisors would hold twice-weekly "discharge calls" with staff from all facilities in their regions to force the facilities to engage in flipping. The call would be run by the Consulate RVP and regional admissions supervisor, and facility staff would typically include each facility's ED, Director of Nursing, admissions director, case management personnel, and social services director. Relator participated in these weekly

calls. During those calls, the RVP would ask how many potential "flippers" each facility had out of its residents on MA plans who were slated to be discharged. The EDs of the facilities on the call would then identify specific residents who could be worth "flipping" to keep them in the facility so that Defendants could continue to receive income for them. Any facility that was not identifying enough potential flippers and successfully flipping them was publicly shamed by the supervisors on the call. After the weekly calls, staff at the facilities, including case management, admissions and rehab employees, would speak to the potential "flipper" residents and any involved family members to try to convince them to disenroll from their MA Plans and stay at the facility longer.

214.   In Relator's experience, Consulate management would focus particular attention on trying to flip residents who were homeless or had no outside family involved. These residents would be targeted for flipping because they would be more likely to stay in the facility without questioning the medical basis for remaining there or insisting on a subsequent discharge.

215.   For example, in or about October 2017, Hillcrest submitted (and Defendants caused to be submitted) one or more false claims for a resident receiving dialysis, M.W. The false claim(s) were based on MDS Assessments completed in or about October 2017. This resident was on a Humana MA plan, which provided her with transportation to dialysis. She was flipped by the facility to Medicare A in order obtain the 100 days of Medicare coverage, under the edict that if a resident will stay long term, the facility needs to get their 100 Medicare days. Medicare, however, does not provide transportation to dialysis and, as a result, the resident's son had to move to Florida from New York to transport his mother from dialysis on Tuesday and Thursday, and roundtrip on the weekend. Resident M.W. was flipped without informing her or her family of the full effect, so that Hillcrest could bill Medicare for 100 days.

216.     When Relator refused to participate in flipping of residents, corporate management personnel came down to meet with her in person.  The Consulate personnel were Alvarez (Consulate Regional Marketing & Business Development ("RMBD") Director until April 2017), Pastor (Consulate RVP of Operations), Julia Medina (Consulate's Director of Business Development ("DBD")), and Kathleen Hawk, who was then the facility ED.  They asked Relator to identify possible flippers and then Alvarez, Pastor, and Medina completed the flipping paperwork to change those residents' insurance coverage.  Pastor was especially aggressive about Consulate's insistence on flipping, telling Relator, "You need to flip these guys, don't let them go home."

217.     In addition, when a resident is to be flipped, there is required paperwork to be signed by the resident, or the resident's family if the resident is incompetent.  The instructions, however, from Justilien and corporate supervisors were to "just take a verbal" authorization for the flipping if the signature is not readily available, in order to expedite flipping.

218.     One HMO physician, Dr. Frances Cadogan, refused to sign off on flipping.  Hillcrest management, including Justilien, would ask Relator to tell Dr. Cadogan that residents' families wanted them to stay longer, despite the fact that Dr. Cadogan had already concluded that the residents could be discharged from therapy.  Dr. Cadogan indicated that she felt it was improper to continue therapy under Medicare for a resident who had already been discharged from therapy while covered by an MA Plan.

219.     On or around October 10, 2017, Dr. Cadogan informed Hillcrest that she was to be removed as the M.D. for any resident that Hillcrest flipped to Medicare in order to continue therapy after discharge under the resident's MA plan, because she could not support or condone the flipping to extend the stays of residents for billing purposes.

74

220.    Eight Hillcrest residents were affected in October 2017. Essentially, just after Dr. Cadogan concluded that these residents did not require additional therapy, they were flipped by Hillcrest to Medicare and therapy orders for multiple therapy sessions per week, for several weeks, were instituted.

221.    Relator has observed that Hillcrest also increases revenues by billing Medicare Part B after the 100-day stay permitted by Medicare Part A. On information and belief, this is a manner by which Genesis and DOR Tolliver improperly increase Hillcrest Medicare billing.

### 6.    Steering of Business to Hospice Provider Heartland Hospice

222.    Justilien also steered work to a particular hospice provider, Heartland Hospice, despite the fact that the other hospice providers can provide better or more comprehensive services or that residents prefer other hospice providers. For example, in August 2017, when a nurse did call VITAS Hospice for a resident, Justilien demanded to know who called VITAS.

223.    Heartland Hospice is affiliated with HCR ManorCare. Dr. Cleopatra Gordon-Pusey, whom Justilien knows, is associated with Heartland Hospice. On information and belief, Justilien has worked for HCR ManorCare, and worked for or received some manner of compensation from Dr. Gordon-Pusey for referring residents to Heartland Hospice.

224.    Before Justilien's arrival in 2016, the prior Facility Director recommended the hospice provider that would provide the best care for each resident. At that time VITAS Hospice had a standing contract for two rooms with two beds at the facility so that there would always be space available for four VITAS Hospice residents. Justilien knew that those beds were paid for under contract with VITAS but nevertheless placed residents in the beds and billed Medicare for their stays. VITAS's marketing representative, Brenda Bean, spoke with Justilien about double billing for those beds, remarking, "we won't look good in orange." Eventually, Justilien did not renew the contract with VITAS Hospice.

225.    Thereafter, Justilien brought corporate executives from Heartland Hospice to Hillcrest to provide a presentation to Hillcrest staff.  Since then, per Justilien's instructions, all hospice requests were to go through Justilien or staff she designated, who directed the referrals to Heartland Hospice.

### 7.    Participation of All Defendants

226.    Pressure was placed on Consulate management by other Defendants to meet expected revenues and budgets based on submission of false claims.  As stated by Formation Healthcare, these business plans come directly from – and performance is monitored by – Formation Healthcare, which is controlled by Formation Capital.

227.    According to EDs Relator has spoken with from various facilities, Consulate RVPs who fail to meet target numbers for revenues and Medicare resident census established by corporate management in their business plans will be demoted.  Relator's region has gone through multiple RVPs over the past few years, and former RVPs have been demoted to EDs of facilities by Consulate.

228.    The schemes set forth herein were directed by the Management Defendants and Genesis Defendants, which in turn were controlled by Formation Capital, the Formation Capital Defendants, the Investor Defendants, and the Individual Defendants.  The Management Defendants employed the regional staff, such as RVPs and regional MDS nurses, who would push the facilities to perform this improper behavior.

229.    Additionally, Relator is aware that individuals referred to as "investors" came to Hillcrest to tour the building on at least four occasions, including when Formation Capital acquired LaVie SNFs.  Maria Seger-Cramer, Consulate RVP accompanied the investors on these visits.  On information and belief, coincident with those visits and as part of increasing the value of Defendants' operations for various investment transactions, Formation Capital (including

76

through Formation Healthcare), Formation Capital Defendants, Genesis Defendants, Management Defendants, Individual Defendants, Landlord Defendants, and Investor Defendants pushed for maximizing Medicare revenue, regardless whether the increased revenue was obtained by improperly increasing the length of resident stays and the RUG scores for each Medicare resident, flipping, or any other scheme, when these Defendants knew or should have known how the revenues were generate by false claims.

230.    Formation Capital, Formation Capital Defendants, Investor Defendants, Genesis Defendants, Individual Defendants, and Management Defendants also furthered the Defendants' conspiracy by hiring and causing the hiring of supervisors and executives who place Medicare reimbursement ahead of the best interests of residents.

231.    Likewise, Formation Capital, Formation Capital Defendants, Landlord Defendants, Investor Defendants, Genesis Defendants, Individual Defendants, and Management Defendants set up a corporate structure that tried to shelter the money paid by Medicare and Medicaid should the United States and Florida ever assert claims against individual SNFs to recover overpayments caused by false or fraudulent claims.

232.    Indeed, as economic pressures have increased on Defendants' operations over time, Relator has observed that the submission of false claims has increased.

233.    During the time that Relator has worked for Defendants, the improper billing of Medicare has increased.  MDS Coordinators are continually under pressure from Consulate supervisors and RVPs to find some way to ensure that billing is maximized regardless of resident status.  Consulate RVPs, in turn, are under pressure from management at the very top of Defendants' organization to ensure that financial targets are reached, including targeted Medicare and Medicaid revenues, regardless of resident status.

234.    Since Hurricane Irma, in early September 2017, AHCA has increased inspections of SNFs. This has led the facility to falsify records to avoid discovery of mistreatment of residents and provision of grossly inadequate services.

235.    For example, Hillcrest management falsified the records of resident E.L. to avoid discovery of her mistreatment. This resident was admitted to the Hillcrest facility on August 4, 2017. Between August and October 2017, Hillcrest submitted (and Defendants caused to be submitted) one or more false claims to Medicare for this resident, which were based on MDS Assessments completed on or around August 11, 2017, September 1, 2017, and October 1, 2017. All three of this resident's MDS Assessments indicated that she was receiving enough therapy to justify billing at the highest RUG level ("Ultra"). The MDS Assessment completed and sent to CMS on or around August 11, 2017, was coded RUL and signed by Defendants' employees "DSANTAMARIA" and "CDORSAINVIL." The MDS Assessment completed and sent to CMS on or around September 1, 2017, was coded RUB and signed by Defendants' employees "DSANTAMARIA" and "LVICTOR1." The MDS Assessment completed and sent to CMS on or around October 1, 2017, was coded RUX and signed by Defendants' employees "DSANTAMARIA" and "VCHAMBERS1." At least three specific Defendant employees "DSANTAMARIA," "LVICTOR1," and "VCHAMBERS1," caused at least three falsified MDS Assessments to be submitted to CMS.

236.    The MDS Assessments submitted to CMS were false and fraudulent, because they contained RUG levels that did not accurately reflect the treatment provided to this resident. The bills submitted to CMS for this resident were likewise false because they contained fraudulently inflated RUG levels reported in those MDS Assessments. Defendants' employees knew, or were

deliberately ignorant or reckless in not knowing, that these MDS Assessments and resulting bills were false.

237.    For example, the MDS Assessment completed on or around August 11, 2017, indicated that this resident:  (1) did not suffer from weight loss; and (2) did not suffer from dehydration.  Similarly, the MDS Assessment completed on or around September 1, 2017, indicated that this resident still did not suffer from weight loss.  It was not until the MDS Assessment completed on or around October 1, 2017, nearly two months after the resident was admitted to Hillcrest, that Defendants noted this resident suffered from weight loss.  Moreover, the October 1, 2017 MDS Assessment continued to note that this resident did not suffer from dehydration.

238.    It is clear, however, that this resident suffered from both weight loss and dehydration, and Defendants refused to provide her with the necessary treatment as required by CMS.  Unfortunately, on October 7, 2017, resident E.L. passed away because of severe malnutrition and dehydration.  An AHCA inquiry was made on or around October 10, 2017.  In order to cover up Defendants' grossly inadequate treatment of this resident, Justilien had a "Do Not Resuscitate" order signed for the resident after her death, backdated to October 6, 2017, one day before the resident expired.  In addition, Justilien directed that false records be prepared misstating the amount of hydration and nourishment E.L. had received leading up to her death.  Relator observed nurses Aileen Johnson and Renata LNU creating those documents after the resident's death, while AHCA was in the facility inquiring about the resident's death.  The nurses were in the MDS office forging the paperwork.  Verna Chambers and Sophrine Brown also witnessed this forgery of documents.  In addition, Hillcrest employees falsely completed pre-death MDS Assessments regarding E.L., failing to disclose the fact that E.L. rapidly lost

79

weight upon entering Hillcrest.  When E.L. arrived at Hillcrest in August 2017, her weight was 113 pounds.  By September 2017, E.L.'s weight had decreased to 99 pounds, which was required to be reported on the MDS Assessment as a weight loss of 5% or more, but it was not reported. By October 2017, E.L.'s weight had declined to 88 pounds, which was finally reported on an MDS Assessment (shortly before E.L.'s death), but her dehydration was not reported on any MDS Assessment.  In addition to being indicative of substandard care, rapid weight loss and dehydration are issues of particular concern that can lead to scrutiny of a SNF.  The failure to report E.L.'s true condition was an effort to hide her true condition (and the treatment of residents at Hillcrest) from SNF inspectors.

239.    Also during the time of Hurricane Irma, an elderly resident, B.O., who required oxygen was deprived of her oxygen by Hillcrest staff, and she died.  Hillcrest employees, including Justilien, lied to AHCA about the number of staff available to care for the residents during the Hurricane, in light of B.O.'s death.

240.    In or around the week of October 16, 2017, a Consulate Corporate Risk Manager, Robin Allen, came to Hillcrest to inquire about a nine-page anonymous letter received by Consulate that reportedly detailed various instances of abuse of residents.  Even though employees regularly report compliance concerns to management, this is the first time that Relator is aware of any Consulate executive coming to inquire about any compliance issues at the facility.  Instead, management's role has been to review conduct at the facility other than to review billing and resident records to identify opportunities for false claims for additional Medicare reimbursement.

241.    In 2017, Assistant Director of Nursing, Hyacinth Holness, left the facility and did not return.  Relator was informed that Holness's departure was because she was asked to do something illegal.

242.    On October 25, 2017, the therapist providing services to resident T.S., who had appeared to be in good spirits and form earlier in the day, threw the resident onto the bed, triggering a fatal heart attack.  The resident died that same day.

243.    Hillcrest also misreports items on MDS Assessments that could trigger inspections of the facility.  For example, one resident, S.C., covered by Medicare, who was not alert and had no family member to advocate on her behalf, was provided such deficient care that she developed four wounds in the facility.  The wounds lingered, but Hillcrest employees misreported the wounds on MDS Assessments and Justilien refused to send S.C. out for care, because she did not want AHCA to know that the resident had wounds.  S.C. died in the facility, likely from her wounds, which had progressed to Stage 4, with an opening the size of a fist when she passed away.  On information and belief, the facility asserted that the death was due to old age.

244.    Despite refusing to send S.C. out for care, Hillcrest and Defendants reported on this resident's MDS Assessments that she received enough treatment to warrant reimbursement at one of the highest RUG Rates:  the RUG "Very High" category.  On or around March through May 2017, Hillcrest submitted (and Defendants caused to be submitted) one or more false claims to Medicare for this resident.  The false claim(s) were based on MDS Assessments completed on or around March 20, 2017, April 3, 2017, April 10, 2017, April 24, 2017, and May 23, 2017.

245.    The MDS Assessments submitted to CMS were false and fraudulent, because Hillcrest and Defendants purposefully omitted information concerning this resident's wounds.

Moreover, the RUG levels listed on the MDS Assessments did not accurately reflect the needs of the resident. The bills submitted to CMS for this resident were likewise false because they relied on the falsified MDS Assessments and contained the fraudulently inflated RUG levels reported in the MDS Assessments. Defendants' employees knew, or were deliberately ignorant or reckless in not knowing, that these MDS Assessments and resulting bills were false.

246.    The MDS Assessment completed and sent to CMS on or around March 20, 2017, was signed by Defendants' employee "CDORSAINVIL." The MDS Assessment completed and sent to CMS on or around April 3, 2017, was coded RUG Very High "RVC" and signed by Defendants' employee "VCHAMBERS1." The MDS Assessment completed and sent to CMS on or around April 10, 2017, was coded RUG Very High "RVC" and signed by Defendants' employee "CDORSAINVIL." The MDS Assessment completed and sent to CMS on or around April 24, 2017, was coded RUG Very High "RVC" and signed by Defendants' employee "SLPERRY." The MDS Assessment completed and sent to CMS on or around May 23, 2017, was signed by Defendants' employee "VCHAMBERS1."

247.    In early 2017, a jury returned a verdict that Consulate's facilities and rehabilitation provider had submitted false claims for over $100 million to Medicare and Medicaid over a period of years. In response, Relator has observed that Defendants have not instituted any training or additional controls to ensure that false claims are no longer submitted. Indeed, when Defendants were put on notice of the fraud and mistreatment of residents at their facilities both at the time of the unsealing of that complaint and then at the verdict, Defendants turned a blind eye to the conditions in their facilities. On information and belief, Defendants did not take any action to investigate further, nor fire any offending

employees. Rather, the culture remains unaltered to this day: false claims are encouraged and required, as described herein.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

248.    Relator and the United States reallege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

249.    Defendants presented, or caused to be presented, false or fraudulent claims to CMS and its agents, other government health programs, and MA Plans.

250.    Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

251.    Accordingly, Defendants are liable for treble damages, civil penalties, and the cost of this action under 31 U.S.C. § 3729(a)(1) and (3).

## COUNT II

### Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

252.    Relator and the United States reallege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

253.    Defendants made, used, or caused to be made or used false or fraudulent records or statements, including MDS Assessments and resident records containing such MDS Assessments and other falsified information, as alleged above.

254.    These false records or statements were material to false or fraudulent claims made to CMS and its agents, other government health programs, and MA Plans.

255.    Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

256.    Accordingly, Defendants are liable for treble damages, civil penalties, and the cost of this action under 31 U.S.C. § 3729(a)(1) and (3).

## COUNT III

### Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G)

257.    Relator and the United States reallege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

258.    Defendants made, used, or caused to be made or used false or fraudulent records or statements, including MDS Assessments and other falsified information, as alleged above.

259.    These false records or statements were material to the obligation to pay or transmit money or property to CMS, its agents, and other government health programs, including the obligation of any Defendants who received money or property to repay money or property previously improperly received from CMS, its agents, or other government health programs.

260.    Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

261.    Defendants concealed or improperly avoided their obligation to pay or transmit money or property to CMS and its agents.

262.    Defendants knew, or were deliberately ignorant or reckless in not knowing, that their conduct concealed or improperly avoided their obligation to pay or transmit money or property to CMS, its agents, or other government health programs.

263.    Accordingly, Defendants are liable for treble damages, civil penalties, and the cost of this action under 31 U.S.C. § 3729(a)(1) and (3).

## COUNT IV

### Violation of the Florida False Claims Act, Fla. Stat. § 68.082(2)(a)

264.    Relator and the State of Florida reallege and incorporate by reference each and

every of the foregoing paragraphs as if fully set forth herein.

265.   Defendants presented, or caused to be presented, false or fraudulent claims to AHCA and its agents.

266.   Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

267.   Accordingly, Defendants are liable for treble damages, civil penalties, and the cost of this action under Fla. Stat. §§ 68.082(2), 68.086.

## COUNT V

### Violation of the Florida False Claims Act, Fla. Stat. § 68.082(2)(b)

268.   Relator and the State of Florida reallege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

269.   Defendants made, used, or caused to be made or used false or fraudulent records or statements, including MDS Assessments and resident records containing such MDS Assessments and other falsified information, as alleged above.

270.   These false records or statements were material to false or fraudulent claims made to AHCA and its agents.

271.   Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

272.   Accordingly, Defendants are liable for treble damages, civil penalties, and the cost of this action under Fla. Stat. §§ 68.082(2), 68.086.

## COUNT VI

### Violation of the Florida False Claims Act, Fla. Stat. § 68.082(2)(g)

273.   Relator and the State of Florida reallege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

274. Defendants made, used, or caused to be made or used false or fraudulent records or statements, including MDS Assessments and other falsified information, as alleged above.

275. These false records or statements were material to Defendants' obligation to pay or transmit money or property to AHCA and its agents – including Defendants' obligation to repay money or property they had previously improperly received from AHCA and its agents

276. Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

277. Defendants concealed or improperly avoided their obligation to pay or transmit money or property to AHCA and its agents.

278. Defendants knew, or were deliberately ignorant or reckless in not knowing, that their conduct concealed or improperly avoided their obligation to pay or transmit money or property to AHCA and its agents.

279. Accordingly, Defendants are liable for treble damages, civil penalties, and the cost of this action under Fla. Stat. §§ 68.082(2), 68.086.

## COUNT VII

### Civil Conspiracy Including FCA Conspiracy Under 31 U.S. Code § 3729(a)(1)(c)

280. Defendants conspired with one another to commit the violations of the Federal and Florida False Claims Acts described in Counts I through VI.

281. Each Defendant knew of the scheme and assisted in furthering it, as described below.

282. Defendant Formation Capital and the Formation Capital Defendants were at the center of the fraudulent scheme. They intentionally established a convoluted system of shell corporations to make it difficult to trace the money received from fraudulent reimbursements. Additionally, they controlled the policies and management of other defendants, including the

86

Management Defendants and their SNFs, such as Defendant Hillcrest.  Representations on Formation Capital's own website indicate that Formation Capital takes an active role in monitoring and managing SNFs within its portfolio, with "real time" data, analyses of regulatory compliance, and in-person site visits.  Employees of Formation Capital, such as Stephanie Hamner, caused the other entity defendants to take steps in furtherance of the conspiracy.  Through its ownership of Defendant Genesis and the Management Defendants, Formation Capital and the Formation Capital Defendants were responsible for the selection and supervision of executives who submitted or caused the submission of false or fraudulent claims for reimbursement.  For example, Defendant Ussery holds his officer position at Consulate Health Care (as Senior Vice President of Revenue Cycle Management) at the will of Formation Capital, and in that role exercises "operational/managerial control" over SNFs including Defendant Hillcrest.

283.    The Genesis Defendants knew of and worked to further the fraudulent scheme.  Defendant Genesis' employees were responsible for entering the false or fraudulent information regarding therapy treatment to be submitted on claims for reimbursement.  Senior management of Genesis actively encouraged this scheme by hiring employees who would work in furtherance of it, such as Ross Tolliver.  The Genesis Defendants also played a crucial role in the scheme by contracting with the SNFs run by the Management Defendants, including Defendant Hillcrest, to receive payments from the SNFs.  This allowed Formation Capital, the Formation Capital Defendants, and the Individual Defendants to withdraw the profits of their scheme indirectly, by diverting hundreds of millions of dollars of those gains to the Genesis Defendants, of which

Formation Capital, the Formation Capital Defendants, and the Individual Defendants were the ultimate beneficial owners.

284.   The Landlord Defendants similarly knew of and worked to further the fraudulent scheme.  The Landlord Defendants were operated by employees of Formation Capital, such as Stephanie Hamner.  By charging steep rents to the SNFs, including Defendant Hillcrest, the Landlord Defendants allowed Formation Capital, the Formation Capital Defendants, and the Individual Defendants to withdraw the profits of their scheme indirectly in the form of rent payments, which would be passed up along the corporate chain back to Formation Capital, the Formation Capital Defendants, or the Individual Defendants.

285.   The Management Defendants actively promoted the fraudulent scheme. Executives of the Management Defendants, such as regional vice presidents, would require SNFs under the control of the Management Defendants to communicate regularly via conference calls in which the Management Defendants would articulate the policies the SNFs were required to implement in order to submit false or fraudulent claims for reimbursement.  The Management Defendants would also replace employees who failed to generate sufficient revenue through the submission of false claims.  According to CMS databases, the Management Defendants are expressly registered as having operational/managerial control over the SNFs at which the conspiracy was executed, including at Hillcrest.

286.   Defendant Hillcrest was a key actor in the fraudulent scheme.  Multiple EDs of the facility, such as Elsie Justilien, overtly required Hillcrest employees to submit fraudulent claims in order to increase reimbursement.

287.   The Investor Defendants knew of and worked to further the fraudulent scheme. Each Investor Defendant was affiliated with Formation Capital.  The Investor Defendants served

88

as conduits for Formation Capital's control of the Management Defendants and Hillcrest and for the distribution of the illicit profits from the scheme. The Investor Defendants deliberately inserted themselves between the Management Defendants and the ultimate owners in order to protect Formation Capital and the Individual Defendants from liability.

288.    Defendants Whitman, Fishman, and Reis knew of and worked to further the fraudulent scheme in their roles as owners and directors of Defendant Genesis. Prior to February 2015, through their control of Formation Capital and its investment partners, Defendants Whitman, Fishman, and Reis were able to control the operations of Defendant Genesis, including its mandates to employees to engage in fraudulent practices. Additionally, in their roles as directors of Genesis, they were able to approve corporate policies that would encourage these practices (and block those that would reveal or curb them), as well as select and set compensation terms for corporate officers who would carry out those practices.

289.    Defendants Hartman, Neuberger, and Low knew of and worked to further the fraudulent scheme by partnering with Formation Capital for its takeover of Defendant Genoa through the Management Defendants in 2011. By gaining control of both the SNFs run by the Management Defendants and Genesis, Formation Capital and the other Defendants were able to implement their scheme and divert the proceeds of the false or fraudulent claims out of the SNFs through payments to the Genesis Defendants, the Landlord Defendants, and the Management Defendants. Defendants Hartman, Neuberger, and Low contributed to this scheme by facilitating that corporate takeover and by interposing their corporate affiliates as investor companies in an attempt to shield Formation Capital and the Individual Defendants from detection and liability.

290.    Defendant Conte knew of and worked to further the fraudulent scheme by controlling the operations of the Management Defendants. Mr. Conte was hand-picked by

Defendant Formation Capital to run Consulate Health Care. In that role, Mr. Conte was expected to and did promote increased revenue through systematic submission of false or fraudulent claims.

291.    Defendants Bryson and Jellerson knew of and worked to further the fraudulent scheme by controlling the operations of the Management Defendants through their roles as COOs of Consulate Health Care. Mr. Bryson was particularly familiar with the scheme because he had previously served as an advisor for Formation Capital before Formation Capital selected him to work as the COO of Consulate Health Care. As COOs, Defendants Bryson and Jellerson were responsible for the operations of Consulate Health Care and the SNFs it controlled, including Defendant Hillcrest. They had the authority to create policies promoting the submission of false or fraudulent claims and used their authority in furtherance of the fraudulent scheme.

292.    Defendants Ragland and Antonik knew of and worked to further the fraudulent scheme by controlling the financial dealings of the Management Defendants through their roles as CFOs of Consulate Health Care and Hillcrest. As CFOs, Defendants Ragland and Antonik had ultimate responsibility for the handling of reimbursements and knew or were reckless in not knowing that the reimbursements received by the Management Defendants and their SNFs were based on false or fraudulent claims. Defendants Ragland and Antonik encouraged the filing of those false claims by declining to take any corrective action to stop the Management Defendants' practice of submitting false or fraudulent claims for reimbursement.

293.    Defendant Ussery knew of and worked to further the fraudulent scheme by controlling the finances of the Management Defendants and their SNFs, including Defendant Hillcrest. Mr. Ussery had operational/managerial control over Hillcrest and, as the Senior Vice

President of Revenue Cycle Management for Consulate Health Care, was responsible for efforts to increase the company's revenue through false or fraudulent claims for payment.

294. Defendant Dias knew of and worked to further the fraudulent scheme by assisting in the creation of the web of legal entities used in the execution of the scheme. Mr. Dias was responsible for the formation or registration of several defendant entities, including Epsilon HCP, Florida HCP, and LVE Master Tenant, each of which was designed to obscure Defendants' illegal conduct and divert the profits from that conduct to thwart enforcement and recovery by the government.

295. All Defendants are aware of the February 2017 jury verdict that Consulate's facilities and rehabilitation providers submitted false claims for over $100 million to Medicare and Medicaid over a period of years. Following that verdict, as demonstrated at the Hillcrest facility, Defendants have not implemented any policy changes at their facilities. The egregious nature of the fraud and abuse, particularly when combined with a previous jury finding of submission of false claims and over $100 million of overcharges to Medicare and Medicaid by the same facilities, indicates that the owners of Consulate, including the Investor Defendants, the Individual Defendants, the Formation Capital Defendants, and Formation Capital, understand what is occurring and by their investment and instructions to their managers to require fraudulent billing and unreasonable resident care, they are liable for causing false or fraudulent claims to be presented to Medicare and Medicaid.

## CLAIMS FOR RELIEF

WHEREFORE, Relator acting on behalf of and in the name of the United States of America and the State of Florida and on her own behalf, demands and prays that judgment be entered as follows against the Defendants:

91

(a)     In favor of the United States against the Defendants for treble the amount
        of damages to Government Programs (including CMS and MA Plans)
        from the Defendants' unlawful activities, plus maximum civil penalties of
        Twenty-One Thousand Nine-Hundred and Sixteen Dollars ($21,916.00)
        for each violation of the federal False Claims Act that occurred after
        February 3, 2017; plus maximum civil penalties of Twenty-One Thousand
        Five-Hundred and Sixty-Three Dollars ($21,563.00) for each violation of
        the federal False Claims Act that occurred between November 2, 2015,
        and February 2, 2017; plus maximum civil penalties of Eleven Thousand
        Dollars ($11,000.00) for each violation of the federal False Claims Act
        that occurred before November 2, 2015;

(b)     In favor of the United States against the Defendants for disgorgement of
        the profits unlawfully obtained by Defendants as a result of their illegal
        scheme;

(c)     In favor of the Relator for the maximum amount allowed pursuant to 31
        U.S.C. § 3730(d) plus reasonable expenses and attorneys' fees and costs
        incurred by Relator;

(d)     In favor of the Relator and the State of Florida against Defendants in an
        amount equal to three times the amount of damages to the State from the
        Defendants' unlawful activities, plus maximum civil penalties of Eleven
        Thousand Dollars ($11,000.00) for each violation of the Florida False
        Claims Act;

(e)    In favor of the Relator for the maximum amount allowed pursuant to Fla. Stat. § 68.085 plus reasonable expenses and attorneys' fees and costs incurred by Relator; and

(f)    Such other relief as this Court deems just and appropriate.

PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS.

Dated:  January 9, 2018

Respectfully submitted,

/s Jonathan Kroner

Silvija A. Strikis
(*pro hac vice to be filed*)
James M. Webster, III
(*pro hac vice to be filed*)
Joseph S. Hall
(*pro hac vice to be filed*)
Bradley E. Oppenheimer
(*pro hac vice to be filed*)
Jeffrey A. Love
(*pro hac vice to be filed*)
Benjamin J. Gottesman
(*pro hac vice to be filed*)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
sstrikis@kellogghansen.com
jwebster@kellogghansen.com
jhall@kellogghansen.com
boppenheimer@kellogghansen.com
jlove@kellogghansen.com
bgottesman@kellogghansen.com

Jonathan Kroner
  (FL. Bar No. 328677)
JONATHAN KRONER LAW OFFICE
300 S. Biscayne Blvd., Suite 3710
Miami, FL 33131
Telephone: (305) 310-6046
JK@FloridaFalseClaim.com

*Counsel for Relator*

94

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing Complaint will be mailed, postage prepaid, certified mail to:

The Honorable Jeff Sessions, Attorney General,
United States Department of Justice,
c/o Sealed Document Civil Process Clerk,
950 Pennsylvania Ave, N.W.,
Washington, DC 20530-001

Benjamin G. Greenberg,
United States Attorney,
c/o Sealed Document Civil Clerk,
99 NE 4th St, Miami, FL 33132

Susan Torres, Assistant United States Attorney,
via e-mail only at Susan.Torres@usdoj.gov

William Olson, Trial Attorney, Civil Fraud Division,
United States Department of Justice, via email only
at William.E.Olson@usdoj.gov

Pam Bondi, Attorney General,
c/o Sealed Document Civil Clerk,
The Capitol PL-01,
Tallahassee, FL 32399-1050

Jimmy Patronis, Chief Financial Officer,
Dept. of Financial Services,
c/o Sealed Document Civil Clerk,
200 East Gaines Street, Tallahassee, FL 32399-0301

Kathleen Von Hoene, Complex Civil Enforcement Bureau Chief,
via e-mail only at Kathleen.VonHoene@myfloridalegal.com.

/s/ Jonathan Kroner
Jonathan Kroner